UNITED STATES of America,
Appellee,

v.

Carl LOVANO and Peter Genova,
Appellants.

Nos. 342, 368, Dockets 33813, 33948.

United States Court of Appeals
Second Circuit.

Argued Dec. 5, 1969.

Decided Jan. 27, 1970.

Harry C. Batchelder, Jr., New York City, (William P. Ford, New York City, on the brief), for appellant Lovano.

Howard S. Sussman, New York City, for appellant Genova.

Andrew J. Maloney, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for Southern District of New York, Peter F. Rient, Paul B. Galvani, Asst. U. S. Attys., on the brief), for appellee.

Before WATERMAN, HAYS and FEINBERG, Circuit Judges.

HAYS, Circuit Judge:

Carl Lovano and Peter Genova appeal from judgments of conviction entered after a jury trial in the United States District Court for the Southern District of New York.

I.

Count One of the indictment on which the convictions of Lovano and Genova

were based, charged appellants and three co-defendants, Cornelius W. Cooley, George Sarantos and Anthony Spitalieri,[1] with conspiring to violate the federal counterfeiting provisions, 18 U.S.C. §§ 371, 471, 472, 473 (1964). Counts Two and Three charged Lovano, Cooley and Sarantos with possession of counterfeit Federal Reserve notes in violation of 18 U.S.C. §§ 2, 472 (1964). Count Four charged Lovano, Cooley and Sarantos with selling counterfeit Federal Reserve notes in violation of 18 U.S.C. §§ 2, 473 (1964).

Only the appellants and Spitalieri, who has not joined this appeal, went to trial.[2] Genova and Spitalieri were convicted on Count One.[3] Lovano was convicted on all four counts.[4]

The only issue that appellants have pressed on this appeal is whether appellants were denied the effective assistance of counsel as guaranteed by the Sixth Amendment. Both the appellants, and Cooley, a co-defendant who pleaded guilty, were represented by the same counsel. Appellants maintain that their defenses were conflicting and could not be presented effectively by the same counsel. They suggest that the desire of their counsel to obtain the lightest possible sentence for Cooley, heightened his already conflicting loyalties.

## II.

The Government's case was presented primarily through the testimony of James D'Amelio, an undercover Secret Service Agent who used the name Victor Russo ("Russo") and George Sarantos, a co-defendant. It showed that on or about April 19, 1967, Sarantos flew to Cleveland, Ohio where Spitalieri met him at the airport. They then proceeded to Spitalieri's home. There they renewed discussions, which had begun through a series of telephone conversations, relating to the possible purchase by Sarantos of some counterfeit money.[5] Sarantos was given a few sample counterfeit bills before he left Spitalieri's home.

Upon his return to New York, Sarantos gave several of the sample bills to appellant Genova and several to Arthur Bianchini, a government informer [6] who used the name Arthur Blanco ("Blanco").

On April 24, 1967 Russo and Blanco met with Genova at the Holiday House Restaurant in Darien, Connecticut. Blanco introduced Genova to Russo. There followed a discussion of the counterfeit bills which Russo stated he was interested in purchasing. Russo indicated that he was not satisfied with the quality of the samples he had examined,[7] and Genova assured him that the finished product would be better.

During the course of the conversation Sarantos came to the table and was introduced to Russo by Genova. Genova told Russo that Sarantos was his connection and that all future arrangements should be made with him. After some bickering about price, Russo placed an

---

1. Also named as conspirators but not as defendants were Arthur Blanco, a government informer whose real name is Arthur Bianchini and Victor Russo, an undercover Secret Service Agent whose real name is James D'Amelio.

2. Sarantos and Cooley entered pleas of guilty to Count One. The other counts involving them were dismissed upon the Government's motion at sentencing. Sarantos, who testified for the Government, received a suspended sentence and two years probation. Cooley was sentenced to a two year prison term.

3. Spitalieri received a five year prison term while Genova was sentenced to imprisonment for three and one-half years.

4. Lovano was sentenced to concurrent terms of three and one-half years on each of the first three counts. On Count Four sentence was suspended and he was placed on probation for five years.

5. Sarantos testified that a person whom he did not know by name, but was able to identify from a photograph shown to him by the authorities, also participated in these negotiations.

6. Blanco became a government informer on or about April 21, 1967.

7. The record is unclear as to how Russo obtained the samples.

order with Sarantos for $250,000 worth of counterfeit bills, delivery to take place in ten weeks. Before the meeting terminated Genova gave Russo a business card and told Russo to telephone if any questions arose.

On May 22, 1967 Genova telephoned Russo to arrange another meeting. The meeting took place three days later at the same Holiday House Restaurant. Present were Russo, Genova and Blanco. Genova told Russo that the counterfeit bills were ready but that Russo would have to accept delivery in Cleveland, Ohio. Russo insisted that delivery take place in New York because his connection wouldn't allow him to leave the state with the money to pay for the bills. Genova said that he would have to check with Sarantos and the meeting ended.

The next day, May 26, 1967, a Friday, Genova again called Russo. He told him that Sarantos was on his way to pick up the counterfeit money and would be back by Sunday. After Genova made this telephone call, his part in the conspiracy ended.

On or about that same Friday, Sarantos, accompanied by Cooley, drove from New York to Spitalieri's home in Cleveland where Sarantos was to take delivery of the counterfeit bills. For an unexplained reason the delivery did not take place. However, before Sarantos and Cooley left, Spitalieri told them he would have the bills sent to New York and would contact Sarantos before they arrived.

Shortly after Sarantos returned to New York, Spitalieri called him and told him that appellant Lovano, who the testimony indicates first entered the conspiracy at this point, was bringing the counterfeit money to New York and would be arriving that night. Sarantos called Blanco who in turn called Russo and arranged for another meeting at the same Holiday House Restaurant. At approximately two p. m. on Monday, May 29, 1967 this meeting took place between Russo, Blanco and Sarantos. Sarantos told Russo that his connection was on the way to New York and would arrive sometime that evening.

When Lovano arrived in New York that night as scheduled, he telephoned Sarantos. Sarantos and Cooley met Lovano somewhere in the Bronx and escorted him to Cooley's apartment, also in the Bronx. There they divided $500,000 worth of counterfeit bills which Lovano had brought with him into two equal parts. Each part was placed in a separate blue suitcase. The three men then left the apartment, taking one suitcase with them and leaving the other behind.

They proceeded to a motel in the Bronx where Lovano and Cooley registered under assumed names. Sarantos and Cooley left the counterfeit bills at the motel with Lovano, and drove to the Adventurer's Inn, a motel in Queens, where at about 11:30 p. m. they met Russo and Blanco. After some disagreement as to where delivery would take place, it was decided that the transaction would be consummated in a motel room which Russo was to obtain.

Russo left and drove to the Bronx Whitestone Motel where he rented room number 216. He then rejoined the others at the Adventurer's Inn. It was agreed that Sarantos would accompany Russo to Russo's motel room. Cooley and Blanco were to meet them there, after they had picked up Lovano and the counterfeit money.

At about 2:00 a. m. on May 30th Blanco entered Russo's room with the suitcase containing the counterfeit money. Since Blanco did not have the key to the suitcase, Russo forced open one of the locks and examined the contents which he determined to be counterfeit $20 bills. He then left the room, saying that he was going to get money from his car to pay for the counterfeit bills. He met Cooley in the parking lot where they bickered about the price to be paid. After an agreement was reached, Russo gave a prearranged signal and secret service agents in the area arrested Russo and Cooley in the parking lot, Sarantos and Blanco in the motel room, and Lo-

vano in his car which was parked in the motel parking lot.[8]

Following the arrests, a search warrant was obtained for Cooley's apartment where the other suitcase full of counterfeit money was seized. Spitalieri and Genova were arrested later.

### III.

Each of the defendants who went to trial took the stand in his own behalf.[9] Genova testified that he and Blanco had been friends for about two years prior to the arrests, and that he had lent Blanco money on numerous occasions. Blanco had claimed to be in trouble with money lenders and had asked Genova to help him obtain some counterfeit money so he could get out of debt. Genova told Blanco he was unable to help him at that time. Sometime later Genova met Sarantos who was trying to sell his restaurant. Genova was interested and during the course of negotiations, Sarantos told Genova he could obtain counterfeit money. Genova saw this as an opportunity to help Blanco and admitted introducing him to Sarantos. However, he denied any knowledge of, or interest in the arrangements between Blanco and Sarantos. He testified that he did not know that $500,000 of counterfeit bills came into New York as a result of this arrangement. In essence Genova claimed that to the extent that he was involved at all, he was entrapped by the informer Blanco.

Lovano testified that he went to New York solely to collect $1000 which Cooley owed to one Soverino. He denied bringing any counterfeit money into New York.

### IV.

On June 7, 1967 Robert Mitchell was appointed as counsel to appellant Lovano pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A. On the same day Mitchell was asked by Cooley to represent him. Mitchell testified that he checked with the Assistant United States Attorney assigned to the case to see if this joint representation would result in a conflict of interest and, upon being assured that it would not, he consented to represent Cooley.

On or about June 22, 1967 appellant Genova asked Mitchell if he would also represent *him*.[10] Mitchell asked the Assistant United States Attorney assigned to the case whether this additional representation would pose a conflict of interest and was assured that it would not.

■ The very fact that two or more co-defendants are represented by the same counsel should alert a trial judge and cause him to inquire whether the defenses to be presented in any way conflict. This is especially true where the trial judge appoints counsel for defendants under the Criminal Justice Act, Morgan v. United States, 396 F.2d 110, 114 (2d Cir. 1968).[11] But care should

---

8. The arrests of Russo and Blanco were, of course, simulated.

9. Spitalieri testified that although he knew Lovano and Sarantos, he knew nothing about the counterfeit money.

10. At the post-trial hearing, Genova testified that he was unaware that Mitchell also represented Cooley and Lovano until the first day of the trial. Mitchell testified that when he first discussed the matter with the appellant, Genova said "You're representing some of the defendants; will you take me?" Judge Frankel stated at a post-trial hearing in the district court, "I would have to find that I do not believe Mr. Genova's testimony on

one aspect which he chooses to make critical. I simply do not believe his assertion that he never knew about Mr. Mitchell's other representations in this case until the first day of trial."

11. The District of Columbia Circuit has fashioned a requirement that at least initially, separate counsel for each co-defendant be assigned under the Criminal Justice Act. Ford v. United States, 126 U.S.App.D.C. 346, 379 F.2d 123, 126 (1967). We have not gone quite so far in this Circuit, although in *Morgan* we said:

"As the Criminal Justice Act, 18 U. S.C. § 3006A now gives the court the means to assign counsel, who receives

also be exercised in the situation before us, where the counsel appointed by the court to represent one defendant was independently retained by two other defendants.[12] See, e. g., Lollar v. United States, 126 U.S.App.D.C. 200, 376 F.2d 243, 246 (1967).

In the instant case, before the jury was impaneled, Judge Frankel, who presided at the trial, was told that Mitchell represented Genova, Lovano and Cooley. While his initial inquiry into the potential problems created by this joint representation was not as comprehensive as it could have been,[13] after the trial Judge Frankel conducted a full-scale hearing on this issue. This hearing produced 102 pages of testimony. The Assistant United States Attorney, Mr. Mitchell and his counsel, and all of the defendants involved—each with separate counsel—were present.

After hearing all of the testimony and arguments, Judge Frankel concluded that Cooley was in no way prejudiced by Mitchell's representation of the other defendants and further stated:

"Without going into the reasons for the conclusion in great detail, and without really having any motions before me from the defendants at this

time, I will indicate my personal judgment that neither of the other defendants, who were represented by Mr. Mitchell, has shown or can show a basis for nullification of the Jury's verdict and the judgment entered thereon.

\* \* \* \* \* \*

And though, out of an abundance of caution, I have ordered this proceeding, I do not think it has produced any substantial issues for these defendants. So I think it ought to stand where it was, and we will stand adjourned."

We agree with Judge Frankel.

█ The rule in this circuit is that some specific instance of prejudice, some real conflict of interest, resulting from a joint representation must be shown to exist before it can be said that an appellant has been denied the effective assistance of counsel. Morgan v. United States, *supra*, 396 F.2d at 114; United States v. Goldberg, 401 F.2d 644, 648 (2d Cir. 1968), cert. denied, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969); United States v. Dardi, 330 F.2d 316, 335 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); United States v. Bentvena, 319 F.2d 916, 937 (2d Cir.), cert. denied sub.

at least a nominal compensation, there is little reason not to appoint separate counsel for defendants where there is any possibility of a conflict of interest, except for those cases where with full knowledge of the facts the defendants themselves request to be represented by the same counsel." 396 F.2d at 114.

12. The fact that Genova voluntarily retained Mitchell or that neither appellant formally objected to their joint representation until after trial does not, without more, constitute a waiver of the claim that they were denied the effective assistance of counsel. "To preserve the protection of the Bill of Rights for hardpressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights." Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942).

13. Judge Frankel was informed that Mitchell represented both Genova and Lovano during a colloquy between Mitchell and

the Assistant United States Attorney regarding Mitchell's request under the Criminal Justice Act for daily transcription of the record:

"The Court: Let me get it straight slowly. You are retained by Mr. Genova?

Mr. Mitchell: Yes.

The Court: And assigned for Mr. Lovano. I take it, I haven't inquired, but since it comes up, I take it that there is no question of any possible conflict in that situation?

Mr. Mitchell: No, none whatsoever. As a matter of fact, I think the District Attorney will concede that it is an entirely different facet of the alleged conspiracy."

During a later pre-trial colloquy the Assistant United States Attorney informed Judge Frankel that Mitchell also represented Cooley. Judge Frankel did not press the conflict of interest inquiry at that point.

nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).[14]

Appellants argue that Genova's claim of entrapment and Lovano's unqualified denial of guilt are inconsistent defenses since Genova admitted and Lovano denied the existence of a conspiracy. They maintain that the same counsel could not adequately present these conflicting positions. This contention would have merit if the relationship between the appellants was such that Genova could have implicated Lovano, or Lovano could have proved that Genova played a greater role in the counterfeiting scheme than he claimed.

However, Genova—who served as the middleman between Russo and Blanco on the one hand, and Sarantos on the other—disappeared from the conspiracy after his telephone call to Russo on May 26th. Lovano's part in the scheme did not begin until three days later when he left Cleveland to bring the counterfeit money to New York. Thus Genova and Lovano were involved in completely different aspects of the conspiracy.

Appellants also argue that Mitchell's representation of Cooley, who pleaded guilty on February 25, 1969, three weeks before the trial, supports their claim of conflict. They contend that Mitchell could not have cross-examined Cooley without prejudicing one or both of them. The short answer to this argument is that Cooley did not take the stand so that the potential problem never arose.

Appellants further suggest that Mitchell did not call Cooley as a witness because his testimony might, while assisting one of them, have had an adverse effect upon the other, or, though assisting both, might have had an adverse effect upon Cooley's sentence. Again appellants present an argument based on mere speculation. Cooley may have refused to take the stand. Moreover, there is no indication that by taking the stand Cooley would have aided either appellant.

Appellant's other allegations of prejudice as a result of their joint representation are even less persuasive than those we have dealt with.

Appellants have done no more than suggest a theoretical conflict of interest and have pointed to no specific prejudice to their cases. We find that their convictions were not in any way influenced by the joint representation.

We affirm the convictions.

14. Except for the District of Columbia Circuit, which has adopted a rule under which separate counsel must be assigned to each defendant under the Criminal Justice Act, see note 11 *supra*, the requirement that a specific instance of prejudice or a real conflict of interest must be shown to exist before it can be said that the effective assistance of counsel has been denied, appears to be the general rule. See, e. g., Glasser v. United States, 315 U.S. 60, 72–76, 62 S.Ct. 457, 86 L. Ed. 680 (1942); Kruchten v. Eyman, 406

F.2d 304, 311–312 (9th Cir. 1969); Fryar v. United States, 404 F.2d 1071, 1073 (10th Cir. 1968), cert. denied, 395 U.S. 964, 89 S.Ct. 2109, 23 L.Ed.2d 751 (1969); Marxuach v. United States, 398 F.2d 548, 551–552 (1st Cir.), cert. denied, 393 U.S. 982, 89 S.Ct. 454, 21 L.Ed.2d 443, (1968); Sawyer v. Brough, 358 F.2d 70, 72–73 (4th Cir. 1966); Porter v. United States, 298 F.2d 461, 463–464 (5th Cir. 1962); Craig v. United States, 217 F.2d 355, 358–359 (6th Cir. 1954).