STATE *ex rel.* ROBERT GORDON POSTELWAITE

*v.*

LEE BECHTOLD, *Sheriff, etc., et. al.*

*and*

STATE *ex rel.* GARY LEE FRAZIER

*v.*

LEE BECHTOLD, *Sheriff, etc., et al.*

(No. 13466)

Decided February 4, 1975.

*Chauncey H. Browning*, Attorney General, *Richard E. Hardison*, Deputy Attorney General, *Betty L. Caplan*, Assistant Attorney General, for plaintiffs in error.

*Catsonis & Linkous and Leo Catsonis*, for defendant in error, Postelwaite.

*Kenneth J. Fordyce*, for defendant in error, Frazier.

HADEN, CHIEF JUSTICE:

This is an appeal by custodial officers of the county and State from a final judgment of the Circuit Court of Wood County in a consolidated habeas corpus proceeding which declared the convictions of Robert Gordon Postelwaite and Gary Lee Frazier to be void and unenforceable on the ground that their jointly retained counsel had rendered ineffective assistance of counsel to each by reason of attempting to defend both against an identical criminal charge in the same trial.

Postelwaite and Frazier had been jointly indicted for the crime of receiving stolen property, a 1968 Ford Mustang automobile. At Postelwaite's expense, attorneys Eugene T. Hague, Senior and Junior, were retained to

represent both on the charge. When indicted, Frazier was an employee of Postelwaite at Capri Motors in Parkersburg. On evidence mainly furnished by two admitted car thieves, both were convicted.

After sentencing, each with separate and new counsel petitioned this Court for a writ of habeas corpus, asserting ineffective assistance of counsel at trial as a ground for rendering their convictions void.

This Court awarded writs of habeas corpus which were subsequently made returnable to the Circuit Court of Wood County where the proceeding was heard and resolved by Special Judge William R. Pfalzgraf.

The sole issue presented in the trial court and here is whether the accused, who were jointly represented by counsel at trial in defense of identical criminal charges, received ineffective assistance of counsel through such joint representation. The resolution of this issue involves an analysis of counsel's ability to defend both clients, as demonstrated at trial, and counsel's trial strategy.

At the *habeas* hearing, extensive testimony was taken of the Hagues, James W. Simonton, the prosecutor who represented the State at the trial, and the relators. Additionally, the special judge considered the criminal trial transcript and relevant exhibits introduced there. This same evidence was presented to this Court for review.

Factually, the circumstances giving rise to the alleged conflict are relatively simple and largely uncontroverted; only the inferences and implications arising therefrom appear to be contested.

The potential hazards of joint representation apparently received very little attention in pretrial discussions between counsel and defendants. Frazier testified to the effect that he had very little pretrial communication with either of the Hagues, and indicated that he received most of his information regarding the preparation of the case through Postelwaite. Postelwaite testified that during general conversation with the Hagues

separate trials were considered, but stated that he relied upon counsel's judgment in this regard. Mr. Hague, Sr., an eminently qualified trial practitioner, did not favor separate trials for his clients and gave the following reason for not requesting a severance:

> "I didn't feel as a matter of defending the case it would be to the best interest of our clients. I felt they could be defended more readily in a joint effort, by having them together in the trial."

Mr. Hague, Sr., also testified that he didn't think severance was ever suggested because "they were innocent, so I didn't feel that was necessary." Mr. Hague, Jr. testified that in the pretrial discussions, it was decided that "We would represent them, that the trial would involve both." Judging from these statements, it is evident that counsel did not anticipate conflict of interest prior to trial. As the defendants were asserting complete innocence, potentially conflicting degrees of incrimination or culpability were not subjects of consideration or discussion.

Notwithstanding the pretrial assessment by the defense, the State, at trial, adduced testimony of two witnesses, Jack Bennett and Randall Hall, which seriously implicated both defendants in the offense charged, and also revealed other related conduct involving either or both of the defendants. Hall testified that he and one George DeBerry stole the Mustang, took it to a garage where he removed certain accessories and thereafter left it on the Montgomery Ward parking lot; that on the following day he went to Capri Motors where he told Frazier and Postelwaite about the car; that Postelwaite said they were going to get it; and that he, Hall, thereafter observed the Mustang at Capri Motors. Hall testified that in a subsequent conversation with Postelwaite, he asked Postelwaite if they wanted to buy any other cars, but that Postelwaite said he "didn't need any then."

Hall and Bennett were also permitted to testify concerning other dealings with Postelwaite or Frazier, or

both, in stolen property to show what the trial court referred to as "modus operandi". Hall testified that in February of 1971 he sold Postelwaite a 1967 Chevrolet for $175.00; that he and DeBerry sold Postelwaite a 1968 Camero in February or March of the same year; and that pursuant to a conversation with Postelwaite, in the presence of Frazier, Postelwaite allowed him, Hall, to take the engine and transmission from the '67 Chevy. Hall also related a similar transaction involving a 1969 or 1970 Volkswagen.

On cross-examination, Hall revealed that he, DeBerry and Bennett had stolen between ten and fifteen automobiles which, except for the ones that were retitled to and driven by them, they sold to Postelwaite and Frazier.

Bennett testified that he learned of the stolen Mustang during a conversation with Hall and DeBerry, and that he thereafter told the defendants about it. He also stated that, "Gary and Bob said they was going to go get it." Bennett stated that he later saw the Mustang at Capri Motors when Frazier and Postelwaite also were present; that Frazier was under the hood "stripping" the car; that Postelwaite gave him $25.00 to get rid of the engine; and that Frazier put the engine on the back of his, Bennett's, truck.

Bennett testified concerning other dealings involving stolen automobiles. He stated that Frazier asked him to get a 1967 Camero, '67 Chevy SS or Malibou; that he thereafter participated in the theft of a '67 Chevrolet which was taken to Capri Motors and sold to Frazier.

The effect of such testimony was assessed by Mr. Hague, Jr. in the habeas corpus proceeding:

> "At the trial, the State's witnesses brought evidence forth concerning involvements with one defendant on one case, another defendant on another, and sometimes involvement with both defendants, and we were limited in that we could not delve into the involvement of one of the defendants for the benefit of the remaining defendant."

Mr. Hague, Sr. made essentially the same observations with regard to cross-examination and, in addition thereto, described the effect thereof upon his summation to the jury:

> "It was the same situation so far as crossexamination was concerned. I thought we could not single out any particular phase of the testimony of either one of these gentlemen without causing some—I used the term injury—I mean unfavorable reaction of the jury to the testimony. By that I mean our defense was we were not guilty, I could not enlarge on Hall's testimony on cross-examination, because he was, as I said before, more than a voluntary witness. He was a witness who involved everybody and everything in all subjects, and I did not feel my examination of him on the argument before the jury should be singled out in any respect. We took the position all during the trial that the defendants were not quilty of any offense, and I so argued it before the jury."

Thereupon, Mr. Hague, Sr. was asked:

> "Weren't you, as stated in your affidavit, limited to a middle-of-the-road approach rather than shifting of the responsibility from one to the other?"

Mr. Hague replied:

> "No doubt about that, yes, sir. That's correct."

Other effects of the joint representation were brought out in the habeas corpus proceeding but were, for the most part, similar retrospective observations based upon the same relative inability to effectively counter the State's witnesses.

On this evidence the circuit court found that a conflict of interest, which prejudiced both relators, evolved from the joint representation at trial. The determination involved has been recognized as, basically, a matter of fact. *Peterson v. Estelle*, 446 F.2d 53 (9th Cir. 1971). Such

findings, made by a trial court in an evidentiary hearing in habeas corpus, will not be disturbed by this Court unless "manifestly erroneous" or "clearly wrong." *State ex rel. Pingley v. Coiner*, ___ W. Va. 186 S.E.2d 220 (1972); *State ex rel. Harrison v. Coiner*, 154 W. Va. 467, 176 S.E.2d 677 (1970).

Although we proceed in the perspective of the foregoing rule, this Court is somewhat limited in its ability to review the facts found because the lower court failed to adhere to the directives of *Code*, 1931, 53-4A-7(c) as amended. That section of the Post Conviction Habeas Corpus Act requires that the final judgment order in such proceeding "shall make specific findings of fact and conclusions of law relating to each contention or contentions and grounds (in fact or law) advanced, shall clearly state the grounds upon which the matter was determined, and shall state whether a federal and/or state right was presented and decided." Findings and conclusions were not stated in the trial court's final order, but the accompanying memorandum opinion substantially fulfilled the requirements of the statute, albeit in somewhat summary fashion:

> "According to the testimony and affidavits of trial counsel, a principal witness for the state, testifying under a grant of immunity, testified as to transactions with each Petitioner as well as joint transactions involving both Petitioners. It further appears from trial counsel's testimony that at least at this point in the trial, it became in the best interest of each Petitioner to emphasize the culpable conduct of the other, a task which, of course, was rendered impossible by joint representation. As counsel testified he was compelled by joint representation to adopt a 'middle of the road' policy rather than to exploit the positive aspects of the witnesses testimony favoring one client to the detriment of the other.

> "It is, in short, cleave (sic) from counsel's testimony, that the defense of each Petitioner was tempered by factors relating to the best interests

> of his co-defendant. This is precisely the hampering effect condemned in cases subsequent to Glasser. *See,* in particular, *Sawyer v. Brough,* 358 F. 2d 70 (4th Cir. 1966)."

As noted, the court found that petitioners did have conflicting interests during their joint trial, obliquely concluding: "While the extent of prejudice resulting therefrom may have been minimal, I cannot find that there was no possibility of prejudice." The court, accordingly, "granted" the writ, which resulted in the discharge of the relators from custody.

In our view the trial court's conclusion of ineffective assistance of counsel, by reason of attempts to represent conflicting interests, was predicated upon defense counsel's failure to attack the damaging inculpatory testimony given by the two car thieves. Without question, the prosecution's adriot questions produced answers which implicated Postelwaite and Frazier separately and then together in the "receiving of stolen property" charge. The degree of culpability attributable to each defendant varied somewhat with the direction taken by the testimony of Hall and Bennett. Nevertheless, each defendant, if the State's witnesses were to be believed, could have been convicted separately rather than jointly, as they were.

Retrospectively, Mr. Hague, Sr. would have moved for a severance. With hindsight, both counsel might have vigorously cross-examined the State's witnesses to test their strength and consistency. When damaging testimony developed in trial, counsel felt "hampered" and obliged to pursue "a middle-of-the-road course," so as not to prejudice either client for the possible benefit of one.

All these considerations could have been of crucial significance if the defense strategy had been to place blame upon the other codefendant. That, however, was not the game plan adopted and pursued by these experienced trial counsel with the acquiescence of their cli-

ents. The following summarized evidence appears to have been ignored or, at least, not given the significance it deserves in the resolution of the charge of ineffective assistance of counsel.

Counsel prepared and executed the defense of this case based upon their clients' early and continuing claims of total innocence of the charge. Accordingly, although the record substantiates counsel's chosen course to pursue, of necessity, the middle-of-the-road defense during trial and summation, once both clients were directly implicated in "receiving," it likewise reveals no effort to change or rectify the situation by motion for mistrial, severance or recusation. Rather, at the conclusion of the State's case, counsel moved for a directed verdict of acquittal, which was overruled. Thereupon, the defense announced that its witnesses would be ready the following morning, and court was adjourned. On the following day, Postelwaite, Frazier, and two other defense witnesses testified. In the face of the State's testimony, Postelwaite denied ever having transacted any business with Jack Bennett or George DeBerry and, also denied that he ever purchased any cars from either of them. He, as well, denied any knowledge concerning the stolen Mustang. Frazier similarly denied any such transactions with Bennett or DeBerry, or Randy Hall and disclaimed any knowledge of the stolen Mustang. The other two defense witnesses, both of whom were employed at Capri Motors at the time of the alleged offense, testified that they were present at Capri Motors most of the evening when the crime was said to have occurred, and, that they had not observed Bennett or the Mustang on the premises. At the conclusion of all the evidence, counsel for defendants renewed the motion for a directed verdict of acquittal, which was denied. Instuctions were tendered, approved and read to the jury. Interestingly enough, the only instructions differentiating between the two defendants were two proffered by the State.

If any general, overriding observation can be gleaned from the evidence, instructions and closing arguments

in the criminal trial, it is that the veracity and credibility of the witnesses—whether prosecution or defense—was determinative of the outcome. The prosecution witnesses, if believed, clearly implicated; the defense witnesses, if believed, clearly exonerated. In view of this, it becomes apparent that the various shades of Postelwaite's as compared with Frazier's involvements in the criminal activity were relegated to positions of no significance by the overall defense strategy. While it is, indeed, conceivable that counsel could have isolated, refined and limited the respective inculpatory accusations of witnesses Hall and Bennett, an achievement of such in one case would have been equally counter-productive in the other. On the other hand, it is neither apparent from the evidence, nor suggested by trial counsel that separate trials for the defendants would have resulted in a net benefit to either or both. We acknowledge that Mr. Hague Sr. stated in the *habeas* proceeding that had he represented only one of the defendants, he would have requested a severance. But, absent some relevant explanation for such observation, it is a patent *non sequitur* in view of the trial strategy pursued by defense counsel.

The courts have not been too receptive to retrospective appraisals of trial strategy. As an example, rather short shrift was given to this type of assertion in *Duran v. United States*, 413 F.2d 596 (9th Cir. 1969):

> "Appellants now criticize the defense 'adopted' from hindsight. If any defense was to be 'adopted,' it might well have been that 'the best defense' for the original four defendants 'to adopt' was to keep them all under the shepherd's crook of one attorney. Their attorney, David C. Marcus, Esq., is a well known and busy criminal defense attorney in Los Angeles, with at least twenty-five years' experience. By no means could his defense of these defendants have been described as a farce, or a sham. That he used an unsuccessful defense does not prove that it was not the best, nor that it was inadequate. '[B]ecause one counsel suggests after the fact, that he thinks

the case should or could have been defended in a different manner. does not make the trial "a farce and a mockery of justice".' United States v. Callison, 408 F.2d 1362 (9th Cir., 1969)." *Id.*, at 599-600.

A total appraisal of the evidence in this case, we believe, clearly indicates a decisive and informed choice to unify the defense against the prosecution along the defense lines of credibility and veracity, giving no quarter to admission, defection, or consortium. Under such circumstances, therefore, it is difficult if not impossible to perceive how, other than by conjecture or surmise, defense counsel, by the dual representation, slighted the defense of one defendant in favor of the other.

Conjecture and surmise will not suffice to brand counsel, appointed or retained, ineffective in the representation of one accused of crime. Conflict of interest precluding effective counsel must be established by the proponent. As was recognized in *United States v. Paz-Sierra*, 367 F.2d 930 (2d Cir. 1966):

> "Thus there is no reason to depart from our 'position' with respect to the requirement that conflict of interest must be shown as a foundation for any claim that joint representation was a deprivation of the right of counsel." *Id.*, at 933.

Accord, *United States v. Dardi*, 330 F.2d 316, 335 (2d Cir. 1964); *United States v. Bentvena*, 319 F.2d 916, 937 (2d Cir. 1963); *Gonzales v. United States*, 314 F.2d 750 (9th Cir. 1963). The "conflict" to be established must be actual, and not merely speculative or theoretical. *See, United States v. Lovano*, 420 F.2d 769 (2d Cir. 1970), where the rule was stated and applied:

> "The rule . . . is that some specific instances of prejudice, some real conflict of interest, resulting from a joint representation must be shown to exist before it can be said that an appellant has been denied the effective assistance of counsel. (Citations omitted)" *Id.*, at 773.

> "Appellants have done no more than suggest a theoretical conflict of interest and have pointed to no specific prejudice to their cases." *Id.*, at 774.

Although joint defense of codefendants may result in the introduction of conflicting degrees of inculpatory evidence, that will not necessarily prove the proscribed "conflicting interests." Such was not dispositive in the defendant's favor in *People v. Gonzalez*, 30 N.Y.2d 28, 330 N.Y.S.2d 54 (1972):

> "In no respect did the individual defenses of appellant and his codefendant run afoul of each other, no did the efforts of counsel on behalf of Rodriguez interfere with appellant's defense." *Id.*, at 59 of 330 N.Y.S.2d.

Although factually distinguishable, the language of *United States v. Gallagher*, 437 F.2d 1191 (7th Cir. 1971), is also appropriate here:

> "The mere fact that the evidence against appellant's co-defendant ... is stronger than that against the appellant does not indicate, must less demonstrate, the existence of a conflict of interest between the defendants. On the record before us, it indicates only that Thomas Gallagher apparently was the dominant member of the conspiracy and played a more prominent role in carrying out the illegal activities involved. That a difference in the weight of the evidence against co-defendants may cause trial counsel to speculate as to the trial strategy he should employ in the cross-examination of a witness, likewise, does not of itself serve to establish that counsel is unable to effectively represent both defendants. ... The existence of a conflict of interest, to warrant the result here sought, must be founded on something more than mere speculation or surmise. We perceive nothing in this record which demonstrates the existence of any real conflict of interest between the defendants." *Id.*, at 1194.

The foregoing authorities serve to illustrate that actual conflict must occur before a court is warranted in declaring a conviction void by reason of ineffective assistance of counsel. Those authorities do not minimize the law's or this Court's abhorrence of actual conflict arising from joint representation. Where such is evident the modern decisions are uniform in condeming joint representation which results in conflict; when found, prejudice is presumed. *See, Glasser v. United States*, 315 U.S. 60, 86 L.Ed. 680, 62 S. Ct. 457 (1942); *Sawyer v. Brough*, 358 F.2d 70 (4th Cir. 1966); *Craig v. United States*, 217 F.2d 355 (6th Cir. 1954); *Holland v. Boles*, 225 F.Supp. 863 (N.D. W. Va. 1963); Annot., 34 A.L.R.3d 470 (1970). *See also*, 21 Am. Jur. 2d *Criminal Law* § 319 (1965).

Fully recognizing the import of actual conflict of interests in representation of accused, this Court, nevertheless, continues to recognize the threshold premise dispositive in *State ex rel. Favors v. Tucker*, 143 W. Va. 130, 100 S.E.2d 411 (1957), *cert. denied* 357 U.S. 908, 2 L. Ed. 2d 1158, 78 S. Ct. 1153 (1958). There, we held:

> "The appointment by a trial court of the same attorney to represent two defendants indicted for the commission of the same crime is not in itself improper unless the facts and circumstances show that the interests of the two defendants are in conflict. * * *" Part *syllabus* point 2., *id.*

Thus, we return to a point of critical significance in a case charging ineffective assistance of counsel. Although ultimately unsuccessful, employment of the consistent defense strategy, maintaining total innocence through "joint effort" and presentation at trial, cannot be ignored by this Court when such was pursued by experienced trial counsel. The option presented to the Court is whether defendants' conviction of the felony of receiving stolen property occurred despite considered trial strategy, tactics and arguable courses of action, voluntarily and understandingly consented to by the accused, or because of involuntary and uninformed acquiescences to

joint representation resulting in conflict prejudicing one or both of the defendants. We conclude for the former.

The distinction between trial strategy gone awry and ineffective assistance of counsel was recently formulated and approved by this Court. That standard, one of which that may be employed to assess constitutionally required effectiveness of counsel, controls the holding of this appeal:

> "Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics or arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." *Syllabus* point 21., *State v. Thomas*, ____ W. Va. ____, 203 S.E.2d 445 (1974).

In the trial below, the circuit court failed to consider those facts which demonstrated the strategy of counsel whose performance was attacked. Its findings were plainly wrong and must be reversed. *Syllabus* point 3., *State ex rel. Pingley v. Coiner, supra.*

Accordingly, the decision of the Circuit Court of Wood County and the order discharging the appellees from constructive custody must be reversed, and the writ discharged.

*Reversed.*