**AMERICAN SAMOA GOVERNMENT, Plaintiff**

**v.**

**CHRISTIAN AMANI, Defendant.**

---

**AMERICAN SAMOA GOVERNMENT, Plaintiff**

**v.**

**JOHNNY O'BRIEN, Defendant**

---

**AMERICAN SAMOA GOVERNMENT, Plaintiff**

**v.**

**SENATI AUAU (a.k.a. SNAG), Defendant**

High Court of American Samoa
Trial Division

CR No. 13-98
CR No. 20-98
CR No. 16-98

March 24, 1998

Before KRUSE, Chief Justice, TAUANU'U, Chief Associate Judge, and SAGAPOLUTELE, Associate Justice.

Counsel: For Plaintiff, Lionel Riley, Assistant Attorney General
For Defendant, Christian Amani, Tautai A.F. Fa'alevao, Public Defender
For Defendant, Johnny O'Brien, Loretta Townsend, Assistant Public Defender
Senati Auau (a.k.a. Snag), Mitzie J. Folau, Assistant Public Defender.

ORDER GRANTING AND DENYING MOTIONS
TO WITHDRAW AS COUNSEL

## Introduction

Co-defendants, Christian Amani ("Amani"), Senati Auau a.k.a. Snag ("Auau"), and Johnny O'Brien ("O'Brien") are charged with violations of A.S.C.A. § 46.4003(a) (Robbery in the Second Degree), A.S.C.A. § 46.4103(b) (Stealing), and A.S.C.A. § 46.3522 (Assault in the Third Degree). These crimes were part of the same incident. Attorneys,

Loretta Townsend, Mitzie J. Folau, and Tautai A. F. Fa'alevao of the Public Defender's office brought a motion in the District Court, before the Honorable John L. Ward II, to withdraw as counsel because of a perceived inability to provide adequate counsel to Christian Amani and his co-defendants. Counsel believe that a potential conflict of interest may occur because they work in the same office. The government even joined in the motion.

The District Court Judge denied the motion. Counsel then sought a civil writ of mandamus from the High Court to compel the District Court Judge to grant the motion to withdraw and assign counsel from the private bar, at further public expense, to two of the defendants. *See Amani v. American Samoa Government*, CA No. 17-98. However, · before the writ application was heard, the defendants were bound over to the High Court to answer the referenced charges against them.[1] The withdrawal motions are properly before this court.

### Facts

For purposes of this hearing, the facts, as may be gleaned from the file and record before us, are that: Mr. Flinn Curren ("Curren") reported an attack which occurred on December 15, 1997. He told police that, as he was walking along the road near Freddy's beach, he saw three Samoan men drinking in the back of a silver pick-up truck. One of the men asked him for money. He said that he did not have any and kept walking. Two of the men climbed out of the pick-up and again asked for money. After Curren repeated that he had no money, he was attacked by these two men. They punched him, and the more heavy-set of the two began kicking him in the head. One of the two men took his briefcase, and both men ran back to the pick-up. After they climbed in, the third man drove the truck away.

The next day, police officers interviewed the three defendants but received conflicting versions of events from them. Amani admitted his involvement in the incident, stating that he and a "Jerry Faga" attacked a "white man" near Freddy's Beach. Amani said that Auau also was involved in the incident (although he did not specify in what way). The other two co-defendants stated, however, that no person by the name of "Jerry Faga" was present during the incident. Amani also showed Captain Te'o and Officer Pese where the contents of Curren's briefcase was dumped. (Affidavit in Support of Arrest Warrant, dated January 27, 1998, p. 2.)

---

[1] O'Brien was bound over following a preliminary examination before the District Court Judge, while his co-defendants were bound over after waiving their right to a preliminary examination.

73

Auau admitted his presence during the incident, but then stated that "he had nothing to do with it," possibly meaning the actual beating. (Affidavit in Support of Arrest Warrant, dated January 27, 1998, p. 2, ¶ 3.) O'Brien admitted that he, Amani, and Auau were involved in the attack on Curren. He alleged that he punched Curren in self-defense because Curren was reaching for a rock. (Affidavit in Support of Arrest Warrant, dated January 27, 1998, p. 2.)

### Discussion

■■■ The Public Defender's Office believes that these defendants' constitutional rights are compromised because of a conflict of interest. However, the representation of more than one accused by the same attorney is not *per se* violative of the Sixth Amendment's constitutional guarantee of effective assistance of counsel. *United States v. Waldman,* 579 F.2d 649 (First Circuit, 1978). No bright-line rules exist with respect to situations involving conflicts of interest; the court must look at the "facts of the particular case" to determine if a Sixth Amendment violation is present and that these acts must be assessed according to an objective standard of reasonableness. *Strickland v. Washington,* 466 U.S. 668, 690 (1984). *See* also *Glasser v. United States,* 315 U.S. 60, 86 L.Ed 680, 62 S.Ct.457 (1942) (holding that the issue of a conflict of interest is a highly fact-specific one).

■■■ At the same time, the court must also bear in mind that an accused is not constitutionally guaranteed the right to "perfect representation," but merely adequate and fair representation. *See Strickland,* 466 U.S. at 687, holding that defendant must meet both prongs of a two-part test for a Sixth Amendment violation to exist, usually a difficult showing to make.[2] The United States Supreme Court defines the standard for judging attorney performance as that of *reasonably* effective assistance considering all the circumstances. *Id.* at 687. *See* also *Trapnell v. United States,* 725 F.2d 149, 151-52 (2nd Cir., 1983); *Cuyler v. Sullivan,* 446 U.S. 335 (1980).

"[T]he benchmark for judging any claim of ineffectiveness must be

---

[2] The *Strickland* court forwarded a two-part test, both prongs of which must be met to show a constitutional violation. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial . . ." *Strickland,* 466 U.S. at 687.

74

whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result," a rather high bar to hurdle for one claiming ineffective assistance of counsel. *Strickland*, 466 U.S. at 686. Moreover, the *Strickland* court ruled that when a defendant forwards such a claim, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. That is, "judicial scrutiny of counsel's performance must be highly deferential," a requirement that would be further likely to thwart most defendants' cries of ineffective assistance of counsel. *Id.*

Furthermore, in the instant case, the Public Defender's argument of ineffective assistance of counsel is further attenuated since each defendant will in fact have his own attorney, albeit within the same office. This situation distinguishes it from cases cited in defendants' motion such as *Holloway v. Arkansas*, 435 U.S. 475, in which a single assistant public defender represented the three defendants at trial.

We understand the constraints and limited resources facing the Public Defender's Office. Although we empathize with this plight,[3] the need for flexibility is simply a fact of life here in American Samoa. Quite obviously, there is no such thing as unlimited resources, and we must explore ways in which to work within the strictures of these constraints. At first glance, we note that, while perhaps inconvenient, many internal accommodations can easily be made by the Public Defender's Office in order to remedy this problem, an initiative that would have altogether obviated the need for the court's intervention. We are confident that, upon further reflection, the Public Defender's Office could find even more ways to promote the interests of their clients. Having stated the obvious, we in turn examine each of the reasons forwarded by the Public Defender's Office that a conflict exists.[4]

*First: Weekly Office Meetings*

We do not believe it is necessary to discuss these particular cases at the

_____

[3] The Public Defender's Office does not have a monopoly on stretched resources.

[4] In searching through the record, we find five reasons cited by the three attorneys for a potential conflict of interest as follows: current practice of weekly attorney meetings; shared support staff—secretary and investigators, and small shared office; current practice of the Public Defender's signing off on plea negotiations; Ms. Folau's inexperience in criminal law; and defendants' conflicting versions of events. We will address each in turn.

weekly meetings. While weekly discussion generally may be a good learning device, suspension of this practice in one instance would not be likely to wreak havoc with the entire workings of the Public Defender's office—and would probably present a minimal inconvenience at the very worst.

Most law offices hold weekly meetings so that lawyers have the opportunity to apprise colleagues of their caseload. But in many situations, such as with cases involving sensitive issues or potential conflicts of interest, lawyers routinely refrain from the free discussion of information. The legal profession as a whole is very conscious of risk management and firms, when necessary, are adept at cordoning off its lawyers to limit their access to information by erecting an imaginary wall between its lawyers.[5]

*Second: Current Approval Procedure regarding Plea Bargains*

We cannot see how the Public Defender's procedure of signing off on plea bargains necessarily constitutes a conflict of interest. First of all, Ms. Townsend has had regular experience in this area already, and we could easily see how the Public Defender would feel confident enough in her judgment to allow her to independently negotiate and finalize a plea offer. Alternatively, preapproved plea bargains may help minimize any potential conflicts. The Public Defender easily could hold a meeting with his associates to discuss what would constitute an acceptable plea offer in advance of an actual plea negotiation. The Attorney General's Office may be able to extend plea offers to all defendants at the same time and set the same deadline for their acceptance.

---

[5] This is an accommodation that is routinely implemented so that a firm may meet the needs of its clients, without jeopardizing the interests of other clients or harshly penalizing its own attorneys. *See* American Bar Association Model Rules of Professional Responsibility, Rule 1.9 (which regards the conduct of a lawyer who has formerly represented a client in a matter and whether that lawyer may represent another client in the same or substantially similar matter.)

A lawyer wishing to move from the public sector to the private sector would be "unhirable," essentially frozen in place, if the law did not make an accommodation for him and the basket of potential conflicts of interest he likely brings with him. Therefore, for the policy reason of wanting to encourage attorneys to work in the public sector, the law allows an artificial or imaginary wall to be placed between her and her colleagues. The law freely allows this accommodation to minimize any conflicts of interest and uphold the integrity of the legal system and not unfairly penalize its lawyers.

*Third: Shared Resources*

We do not believe that sharing a secretary among three lawyers is necessarily problematic, or indeed worrisome enough to necessitate constitutional review. Elsewhere, secretaries in law offices often support more than one attorney, however this arrangement seldom produces a problem. Members of the support staff are expected to maintain professionalism, discretion, and confidentiality. Even if the Public Defender secretary grasps the legal nuances of cases she may handle, we see no reason for her to discuss the case of one lawyer with another lawyer. So too with the investigators. Support staff need only answer to the individual assigning the task.

*Fourth: Inexperience of Ms. Folau in Criminal Law*

Even though Ms. Folau is the newest member of the Public Defender's office, we trust that she is a competent attorney. We understand that she has had prior exposure to criminal law, having served as a judicial law clerk, and, therefore, has experience in researching and arguing points of law. If it is necessary for her to consult with another attorney in this matter for more specialized direction, other members of the American Samoa Bar who have expertise in criminal law are available for her to consult outside of the Public Defender's Office.[6]

*Fifth: Conflicting Stories*

Counsel appear distraught that the defendants' versions of events conflict. That a defendant's story will differ with that of another co-defendant or change depending on the time of day is a reality of criminal defense. We are simply unable to grasp how this truism translates into a conflict of interest.

The court offers this listing of suggestions. With each suggestion given, other possibilities to minimize potential conflicts surely exist. While they may be inconvenient for counsel, they are not impossible to ferret out and implement. We, therefore, direct the Public Defender to explore additional ways in which to minimize any potential conflicts of interest, including working with the Attorney General's office. We also note that Mr. Riley has already been informed of his duty to conduct himself in a

---

[6] Lawyers often effectively consult with their colleagues regarding point of laws without compromising their client's confidentiality, for example. Lawyers do this all the time—speaking in terms of generalities, hypotheticals, past cases. We have confidence in our attorneys' flexibility and adaptability.

manner that would not exacerbate the potential for a conflict.[7]

■ Furthermore, the above discussion assumes—rather generously—that a conflict indeed exists. However, we are in fact dealing with a *potential* conflict.[8] In this order, we essentially have been indulging the Public Defender's evanescent spectre of the sheer *possibility* of a conflict. Notwithstanding our willingness to entertain this argument, the fact still remains that a potential conflict of interest does not rise to the level of a constitutional violation. *United States v. Lovano*, 420 F.2d 769 (Second Circuit, 1970). An actual present conflict of interest must exist to trigger judicial review. *United States v. Johnson*, 569 F.2d 269 (Fifth Circuit, 1978). In this case, we see nothing here that would either *presently* compromise these attorneys' ability to provide their clients with effective representation or would constitute a violation of the American Bar Association Model Rules of Professional Responsibility, Rule 1.7, the general rule regarding conflicts of interest. If a conflict ever arises, we can cross that bridge when *and if* we get to it.

We have assessed the Public Defender's arguments using an objective standard of reasonableness according to the facts of this specific situation and agree with the District Court's findings regarding the representation of O'Brien and Amani. We do not believe a risk exists that these defendants will be deprived of their Sixth Amendment right to effective counsel.[9] The reasons presented to us by the Public Defender's Office with respect to these two defendants are wholly unconvincing, and certainly none compelling enough to justify the expenditure of funds for each of these defendants. A continuum exists between that which is clearly proscribed and that which, while not ideal, is acceptable.

In sum, inconvenience, while not pleasant, is a fact of life, especially in a small territory with financial limitations. It does not translate, however, into justification for the independent assignment of counsel. Moreover, the wise allocation of resources militates against this superfluous request.

---

[7] *See* District Court Transcript of Proceedings, February 13, 1998, p. 3, ¶¶ 15-19.

[8] The Public Defender himself probably best assessed the situation: "[the conflict] is something that has not yet taken place, but [is only] a potential conflict here." District Court Transcript of Proceedings, February 13, 1998, p. 5, ¶¶ 13-14.

[9] *See* Transcript of Proceedings, February 13, 1998, p. 4, ¶¶ 20-22, in which Judge Ward aptly encapsulates the standard for representation. "[A] defendant is not guaranteed the absolute perfection. A defendant is guaranteed effective counsel. That's reasonably effective counsel. There's no perfection. There's no perfect trial. There's a fair trial."

■ Ms. Folau informs this court that she and O'Brien are closely related. Because Auau is pointing a finger at his co-defendant, O'Brien, Ms. Folau contends that her ability to represent Auau is compromised, constrained by her family loyalties. The zealous representation of her client would be directly adverse to the interests of her relative, O'Brien. As she promotes one defendant's interests she damages those of the other. Given her relationship to O'Brien, her access to privileged and confidential information of her client, Auau, could easily be perceived to color her representation of him. We, therefore, find that the effective representation of Auau by Ms. Folau is not possible and a conflict of interest exists as defined under the American Samoa Bar Association Rules of Professional Conduct and the standard of effective counsel as set forth in *Strickland*.

■ We feel it necessary, however, to note the role the Office of the Public Defender itself had in the orchestration of this conflict, a fact upon which we look with great disfavor. This conflict of interest was artificially created by defense counsel. The defendants were assigned by the District Court to the Public Defender's Office one defendant to one attorney "however they liked." The District Court in no way specified which attorney was to be assigned to which defendant. In fact, lest an iota of confusion exists, Judge Ward made it exceedingly clear that the way in which this allotment would be made was solely a prerogative of the Public Defender's office stating: "As previously directed, each defendant shall be represented by a separate, single . . . attorney from the Office of the Public Defender." Notice of Motion to be Relieved as Counsel, February 12, 1998. *See also* Reporter's Transcript of Proceedings in the District Court, February 13, 1998.[10] At another time,

---

[10] Tautai: ". . . I don't know which counsel I represent. The Court has ordered specifically -- says I represent who?"
The District Court: "Counsel, it's my understanding you represent O'Brien, I believe."
Tautai: "Can we have a choice?"
Townsend: "Well, I just picked him."
The Court: "Counsel, it's my understanding that you were representing the defendant seated behind you."
Tautai: "Who's that? I don't know which of the defendants I'm representing and that's why I'm inquiring."
The Court: **"I did not specify it. When the Public Defender's Office was appointed to represent these individuals, I directed counsels to take one defendant per one attorney however they may be allocated."**

the court wrote: "The math is fairly simple—one client per one attorney of the Public Defender's Office. The Court did **not** appoint one attorney to represent all three defendants." District Court Order, February 10, 1998. (Note: emphasis was added by the District Court.) The conflict of interest, therefore, arose as a result of the mismanagement of the Public Defender's Office—and could easily have been avoided.

We cannot say with certainty who is at fault for this artificially-created conflict—whether Ms. Folau failed to inform others in the office of the conflict of interest she has with Mr. O'Brien, whether Mr. Tautai knew about the conflict before the confidentiality of the cases was breached and would have been in the position to have stopped the conflict, or whether Ms. Townsend simply took the case at random without inquiring into the possibility of a conflict of interest.[11] What we do know for certain is that this "conflict" could easily have been short-circuited with the assignment of O'Brien's case to Ms. Folau. Why that was not done can only remain a matter of speculation. However, the waste of resources that this mistake has caused is clearly fact.

■ The fund allocated the court in the current financial year for *pro bono* legal defense is limited and seriously depleted. The conflict and its attendant public expense are unnecessary. The Public Defender would do well to heed the realities of a very limited *pro bono* legal defense fund and employ better case management. Future mistakes entailing needless and additional public expenditure may well attract sanctions.

## Conclusion

Counsel Townsend and Tautai's motion to withdraw is denied.

Counsel Folau's motion to withdraw is granted.

It is so ordered.

---

District Court Reporter's Transcript of Proceedings, February 13, 1998; 11:5-18.

[11] During the hearing in support of counsel's motion to withdraw, counsel Ms. Townsend stated that she "just picked [O'Brien]." District Court Reporter's Transcript of Proceedings, February 13, 1998; 11:11