444 S.E.2d 43

**LARRY L., Petitioner Below, Appellant,**

**v.**

**STATE of West Virginia, Respondent Below, Appellee.**

No. 21870.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 12, 1994.

Decided April 20, 1994.

Dissenting Opinion of Justice Neely April 25, 1994.

---

Scott A. Ash, Public Defender's Office, Princeton, for appellant.

George P. Surmaitis, Asst. Atty. Gen., Charleston, for appellee.

PER CURIAM:

This case relates to an appeal by the parents of a juvenile, Larry L., from a February 26, 1993, ruling of the Circuit Court of Mercer County, West Virginia, adjudicating him delinquent. Larry was placed in the physical custody of the Department of Health and Human Resources. He has since been placed in the West Virginia Children's Home in Elkins.

On April 1, 1992, the parents of Larry L. filed a petition claiming that the child was delinquent within the meaning of W.Va.Code § 49–1–4 (1992). They reported that he was disruptive in class and at home and was often truant from school. Upon reviewing the case, the court granted the child a one-year improvement period on May 29, 1992. Initially, Larry's behavior improved at home. However, there was no improvement at school. Thus, Larry's parents agreed that he would live with Mr. and Mrs. Larry Bailey, and attend the Matoaka School.

There was some improvement while Larry lived with the Baileys. Although his home behavior was good, the Baileys found it necessary to attend classes with Larry in order to ensure his attendance and behavior. On some days he would do quite well, but then relapse into the disruptive behavior and get into trouble again. Larry had problems with homesickness, and on one occasion, ran away from the Baileys in an apparent attempt to go home. In December, 1992, he was returned to his parents' home, and his mother continued to take him to the Matoaka School. He was suspended from Matoaka occasionally. Shortly thereafter, he returned to Princeton Junior High School. The assistant principal noted that Larry was still disruptive in class and continued to leave school on occasion without permission.

On January 15, 1993, a petition for a revocation of the improvement period was filed with the circuit court by Karen Child, the juvenile probation officer. On February 5, 1993, the Circuit Court of Mercer County heard evidence on the petition and adjudicated the appellant delinquent. Testimony taken during the hearing revealed that although Larry was intelligent, he showed no interest in any constructive program to improve his behavior and that the school principal did not believe there had been any behavioral im-

provement at all. His mother appeared and testified regarding Larry's past and current behavior. She stated that he was behaving well at home. The court revoked the improvement period and placed the juvenile in the legal custody of the West Virginia Department of Health and Human Services. By order dated March 5, 1993, he was placed in the West Virginia Children's Home in Elkins, but the order was stayed pending the appeal from that ruling. On April 4, 1993, the stay was lifted and the child placed in the Children's Home in Elkins. The juvenile now seeks to be returned to his home with his parents.

The Attorney General notes that the West Virginia Children's Home in Elkins is a non-secure facility which provides diagnostic services for the juvenile residents. At this facility, Larry would be able to receive psychiatric care and treatment while committed to the home.

■ West Virginia Code § 49–5–1 *et seq.* (1992) sets forth the requirements for juvenile proceedings. West Virginia Code § 49–5–13 provides that:

[T]he juvenile probation officer ... shall, upon request of the court, make an investigation of the environment of the child and the alternative dispositions possible ....

(b) Following the adjudication, the court shall conduct the dispositional proceeding, giving all parties an opportunity to be heard. In disposition the court shall not be limited to the relief sought in the petition and shall give precedence to the least restrictive of the following alternatives consistent with the best interests and welfare of the public and the child:

(1) Dismiss the petition;

(2) Refer the child and the child's parent or custodian to a community agency for needed assistance and dismiss the petition;

(3) Upon a finding that the child is in need of extra-parental supervision (A) place the child under the supervision of a probation officer of the court or of the court of the county where the child has his or her usual place of abode, or other person while leaving the child in custody of his or her parent or custodian and (B) prescribe a program of treatment or therapy....;

(4) Upon a finding that a parent or custodian is not willing or able to take custody of the child, that a child is not willing to reside in the custody of his parent or custodian, or that a parent or custodian cannot provide the necessary supervision and care of the child, the court may place the child in temporary foster care or temporarily commit the child to the state department or a child welfare agency. The court order shall state that continuation in the home is contrary to the best interest of the child and why; and whether or not the state department made a reasonable effort to prevent the placement or that the emergency situation made such efforts unreasonable or impossible. Whenever the court transfers custody of a youth to the department of human services, an appropriate order of financial support by the parents or guardians shall be entered in accordance with section five [§ 49–7–5], article seven of this chapter and guidelines promulgated by the supreme court of appeals;

(5) Upon a finding that no less restrictive alternative would accomplish the requisite rehabilitation of the child, and upon an adjudication of delinquency pursuant to subdivision (1), section four [§ 49–1–4(1) ], article one of this chapter, commit the child to an industrial home or correctional institution for children. Commitments shall not exceed the maximum term for which an adult could have been sentenced for the same offense, with discretion as to discharge to rest with the director of the institution, who may release the child and return him to the court for further disposition. The order shall state that continuation in the home is contrary to the best interests of the child and why; and whether or not the state department made a reasonable effort to prevent the placement or that the emergency situa-

tion made such efforts unreasonable or impossible; [1]

This Court has interpreted W.Va.Code § 49–5–13(b)(5) to require a certain finding on the record before a juvenile can be committed:

> In order for a juvenile to be properly committed to a juvenile correctional facility, W.Va.Code § 49–5–13(b)(5) (1978) requires a "finding" that "no less restrictive alternative would accomplish the requisite rehabilitation of the child." The failure to set forth such a finding on the record deprives the Court of authority to order such a commitment.

Syl. pt. 1, *State ex rel. S.J.C. v. Fox*, 165 W.Va. 314, 268 S.E.2d 56 (1980). Unlike the armed robbery which was the basis of the juvenile proceedings in *Fox*, this case involves the lesser status offense of truancy. However, a determination of whether "no less restrictive alternative" could achieve the same intended rehabilitative effect on the child is still required.

After reviewing both the record and the briefs in this case, we conclude that there was insufficient evidence for the court to determine whether commitment was in the child's best interests. There is no evidence that any psychological evaluation or counseling was attempted, assuming that such services were available in the child's community.[2] It is unclear whether the parents wanted Larry to return to their home and whether they believed that they could handle him. While the Attorney General's brief states that the mother did not testify that she wanted Larry to return, it is possible that since no one asked her, she just didn't say. There is no evidence that any other alternatives had been explored, with the exception of the brief period of time spent in the Baileys' home, prior to the decision to commit Larry to the Elkins Children's Home.[3] The decision to

remove a child from the family home and send him to a group juvenile facility is one to be taken very seriously. This is not to say that juvenile homes are undesirable: such facilities serve an important and necessary function. Rather, we simply mean that such a commitment should not be undertaken without a complete and accurate evaluation. Commitment is not necessary if the juvenile's problem can be treated or solved through out-patient counseling or other therapy.

Because of the serious ramifications of a juvenile commitment, it is impossible for us to find that committing Larry L. is the least restrictive alternative, when we can find no record of any physical, psychological, or educational diagnostic evaluation to determine the nature of Larry's underlying problem, especially where essentially only a status offense is involved. No such finding was made on the record, and thus, the circuit court had no authority to order such a commitment.

Accordingly, under the circumstances of this case, we reverse the March 5, 1993, order of the Circuit Court of Mercer County and remand the case for further proceedings which would include a complete workup and evaluation of the juvenile's problems and probable solutions by qualified persons rather than a commitment to a juvenile facility. This is not to say that the circuit court does not have the authority to commit if the record discloses facts that make immediate commitment necessary pending further evaluation, within a reasonable period of time.

Reversed and remanded.

NEELY, Justice, dissenting:

April 25, 1994.

The majority opinion in this case is the supreme exaltation of form over substance. The entire record in this case as recited by

---

1. West Virginia Code § 49–5–13(b)(6) & (7) deal with commitment of children to secure facilities and provide for commitment to a mental health facility.

2. Circuit courts must look at the seriousness of the offense alleged, as well as the availability of local evaluative services in determining whether removal from the home community is justified. Obviously, the more serious the offense alleged, as well as the quality and reasonably quick avail-

ability of evaluative resources in the community, must be examined and balanced.

3. Another important consideration for the circuit court to make is whether the home setting is conducive to helping the child. Where the home is part of the problem, removal of the child from the home may be in his best interests. There is nothing in the record before us at this point to indicate the home and family setting contributed to the child's problems.

the majority cries out for the conclusion that no less restrictive alternative than the Elkins Children's Home was available for Larry.

Furthermore, as the majority so succinctly explains, the Elkins Children's Home is a non-secure facility with numerous diagnostic and supportive services available. Sending Larry to the Elkins Children's Home involves a very substantial investment of State money to help Larry, who is in sore need of serious help. Larry's parents can't cope with him; the Matoaka Junior High School can't cope with him; the Princeton Junior High School can't cope with him; and, Mr. and Mrs. Bailey apparently can't cope with him. What less restrictive alternative does the majority have in mind?

Even a blind hog gets an acorn from time to time, so there are, indeed, some notable mental health success stories. Whether the patients would have done as well to have spent the same amount of time with their local bartender is, of course, problematic; nonetheless, bartenders aren't qualified for either State money or Medicaid funds, which makes them undependable community mental health resources for those too impecunious to buy their own drinks or too young to go to bars.

With all that in mind, I suppose that down in Princeton we could have referred Larry to the ministrations of one of the better off-duty bartenders, or we could have let him act out for another two years in the public schools where a little maturity *might* (but only *might*) have cured him in the natural course of things.

On the other hand, the difference between a status offender like Larry and a criminal offender who commits armed robberies or gets himself killed dealing drugs is about two weeks on the street. The Elkins Children's Home, while perhaps not ideal, is way ahead of whatever is in second place for Larry.

For all these reasons I dissent.