591 S.E.2d 288

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**KIRK N., Defendant Below, Appellant.**

No. 31315.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 28, 2003.

Decided Dec. 4, 2003.

Davis, J., filed dissenting opinion.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, for Appellee.

Stephen S. Fitz, Fairmont, for Appellant.

STARCHER, C.J.:

In this case we affirm a juvenile adjudication and disposition by a circuit court.

## I.

### Facts & Background

This is an appeal by Kirk N.[1] ("the juvenile") from an April 22, 2002 dispositional order of the Marion County Circuit Court ("the court" or "the circuit court"), committing the juvenile to the Industrial Home for Youth until his twenty-first birthday.

A juvenile petition, filed on July 13, 2000, alleged that the juvenile committed acts which, had he been over eighteen, would have been felonies pursuant to *W.Va.Code*, 61–8B–4(a)(2) [1991] (second degree sexual assault upon a physically helpless victim) and *W.Va.Code*, 61–10–31 [1971] (conspiracy to commit a felony). The juvenile was adjudicated delinquent following an adjudicatory trial before a jury held from November 7 to November 9, 2001.

---

1. As is our custom in certain sensitive cases, we use initials instead of last names.

On appeal, the juvenile (through his original court-appointed trial counsel, who has represented the juvenile since he was first charged) contends that the circuit court violated the juvenile's constitutional right to the effective assistance of counsel at trial, and that the court's dispositional order committing the juvenile to the Industrial Home for Youth, was an abuse of discretion.

On July 13, 2000, the Fairmont City Police Department filed a juvenile petition alleging that on the evening of July 8, 2000, the juvenile had sexual intercourse with the victim (we omit her name) while she was physically helpless, and that the juvenile conspired with another juvenile to commit this act.

The petition's caption listed the juvenile and his father as "Respondents," as required by *W.Va.Code*, 49–5–7(b) [2003].[2] The petition stated, *inter alia*, that "the child and his parent(s) or custodian(s) have the right to legal counsel at each and every stage of the proceedings under the petition. Further, if the child cannot afford an attorney, or if the parents, or custodian of the child cannot afford to retain an attorney to represent the child, an attorney will be appointed to represent the child."

The court entered an order filing the juvenile petition on July 14, 2000, which set a preliminary hearing date of July 31, 2000. The court's order also states: "If the juvenile and/or his/her parents or custodians do not have an attorney and cannot afford one, they should appear before the circuit court prior to the preliminary hearing and have counsel appointed for them." Pursuant to the order, copies of the petition, the order filing the petition, and summonses for the preliminary hearing were served upon the juvenile, his/her parents or custodians, and upon the West Virginia Division of Human Services.

The juvenile was represented at a preliminary hearing (and throughout two trials) by a publicly-paid, court-appointed lawyer (who is, as noted, the juvenile's present counsel in this appeal). Following the preliminary hearing, the court found probable cause to believe that the juvenile had committed an act of juvenile delinquency. The court released the juvenile into the custody of his parents, set bond at $10,000.00, and set a curfew of 7:00 p.m. The juvenile's parents posted bond; his parents were not represented by counsel at the preliminary hearing. However, at some point, the juvenile's father hired a private attorney.

The adjudicatory phase of the juvenile's case was tried before a jury from May 9 to May 10, 2001. Prior to trial, on May 1, 2001, the court held a hearing on, *inter alia*, a motion by the prosecution *in limine* seeking to prevent the lawyer hired by the father from participating in the adjudicatory hearing.

At this hearing, the juvenile's court-appointed lawyer and the lawyer hired by the father argued that the lawyer hired by the father should be allowed to participate in the adjudicatory hearing, because the naming of the parents as respondents made them separate "parties" in the proceeding.

The trial court stated that the Legislature probably did not intend that parents be allowed to participate in an adjudicatory hearing as parties. But, the court reasoned, because *W.Va.Code*, 49–5–7(b) [2003] requires the parents to be named as "respondents," the parents had the right to participate, as parties, with their own separate counsel, in the adjudicatory hearing.

However, the court also held that because the court perceived that the legal interests

---

**2.** This statute provides:

 (b) The parents, guardians or custodians shall be named in the petition as respondents, and shall be served with notice of the proceedings in the same manner as provided in subsection (a) of this section for service upon the juvenile and required to appear with the juvenile at the time and place set for the proceedings unless such respondent cannot be found after diligent search. If any such respondent cannot be found after diligent search, the court may proceed without further requirement of

notice: Provided, That the court may order service by first class mail to the last known address of such respondent. The respondent shall be afforded fifteen days after the date of mailing to appear or answer. *W.Va.Code*, 49–5–7(b) [2003]. (The 1998 version of this statute, that applied to this case, was essentially the same.)

 The lower court later construed this statute as making the juvenile's parents "parties" to the juvenile proceedings, *see* discussion *infra*.

of the parents and the juvenile were the same, the lawyer hired by the father and the juvenile's court-appointed lawyer should be required to act as "co-counsel." More specifically, the court's ruling permitted both attorneys to submit proposed jury instructions; to call and subpoena witnesses; to give closing arguments; to submit and argue motions on the juvenile's behalf; and to object to the State's examination and cross-examination of witnesses.

However, the court would not permit both attorneys to cross-examine witnesses, to *voir dire* the jury, or to deliver opening statements. The lawyers were to agree between themselves as to which lawyer would conduct each of these activities.

Both lawyers objected to this portion of the ruling, each claiming that both attorneys should be entitled to examine every witness—because both the parents and the juvenile were parties. In response to the court's ruling, neither lawyer suggested that there was or might be any potential or actual "conflict of interest" or other obstacle to a "co-counsel" arrangement between the juvenile and his parents (or between their counsel). In other words, neither lawyer challenged the court's statement that the juvenile and his parents had identical interests in the proceeding. The juvenile's court-appointed lawyer stated that he was pleased to have the participation of the parents and the lawyer hired by the father.[3]

A trial ensued, but after the jury deliberated for less than one day they informed the court that they were hopelessly deadlocked. On May 11, the court declared a mistrial. By order dated June 7, 2001, the court released the juvenile upon his previous bond.[4]

On May 17, 2001, the lawyer hired by the father filed a "Post–Trial Motion for Judgment of Acquittal." On May 24, 2001, the juvenile's court-appointed lawyer also filed a separate "Post–Trial Motion for Judgement of Acquittal." Neither motion alleged that there was any actual or potential conflict of interest between the juvenile and his parent, or that the "co-counsel" arrangement had in any identified way impaired the defense of the juvenile's or the parents' interests. Neither attorney sought to withdraw, requested that the court appoint a guardian *ad litem*, or suggested that either attorney should be disqualified from acting on behalf of the juvenile. The court denied both post-trial motions.

The case was retried to a twelve-member jury from November 8 to November 10, 2001. The lawyer hired by the father conducted *voir dire*;[5] the juvenile's court-appointed lawyer presented opening arguments; and either the lawyer hired by the father or the juvenile's court-appointed lawyer (not both) cross-examined each of the States' witnesses.[6] The court did not specify which lawyer should examine specific witnesses. The court permitted the lawyer hired by the

3. The State therefore argues that any argument based on actual or potential conflicts of interest between the juvenile and his father were waived. *Cf. State v. Simons*, 201 W.Va. 235, 239–240, 496 S.E.2d 185, 189–190 (1997) (specific objection regarding the admissibility of evidence operates as a waiver of other grounds). In light of our ruling we need not address this issue.

4. Because the juvenile had violated a condition of his original bond, the court had first detained him and then placed him on home confinement as a condition of bail.

5. During *voir dire*, the questions by the lawyer hired by the father were designed to uncover any potential prejudices or biases that potential jurors might have against the juvenile, not the juvenile's parents. He asked the panel if they understood the State's burden of proof, and the right of the juvenile not to testify. He exercised

one strike for cause after a juror indicated that he would convict the juvenile if the State proved any improper conduct, even if that conduct did not fall within the parameters of the charges contained in the petition. Earlier, on March 21, 2001, the lawyer hired by the father filed a motion requesting home confinement for the juvenile. On April 12, 2001, he filed a motion entitled, "Juvenile's Omnibus Motion," which included a request for discovery, a motion to suppress statements by the juvenile, a motion to suppress physical evidence, and a motion for individual *voir dire*.

6. The juvenile's brief does not cite to any instance in which the lawyer hired by the father failed to effectively represent the juvenile during cross-examination. There is nothing in the record which would indicate that his cross-examinations were limited by his employment by and nominal representation of the juvenile's parents.

father to call several witnesses on behalf of the juvenile.

The juvenile chose not to testify. The juvenile's court-appointed lawyer and the lawyer hired by the father both gave closing arguments. After deliberating for approximately six hours, the jury found the charges in Counts I (sexual assault) & II (conspiracy) of the juvenile petition to be true beyond a reasonable doubt, and thereby adjudicated the juvenile as delinquent.

On appeal, the juvenile does not challenge the sufficiency of the evidence supporting the jury's findings. Nor does the juvenile point to any factual element of the charged offenses that would not have been sufficiently proven absent the alleged ineffective assistance of counsel that forms one of the bases for his appeal. We set forth in a footnote a summary statement of facts taken from the evidence at trial, assuming that the jury believed those pieces of evidence consistent with their verdict. Our independent review of the record shows that the evidence supporting these factual statements was sub-stantial.[7] We mention such other facts as are pertinent in our discussion *infra*.

By order dated November 29, 2001, the court ordered the juvenile probation department to prepare a predisposition report, and also ordered the juvenile to undergo a sexual offender screening in order to determine his eligibility for probation.

On December 10, 2001, the lawyer hired by the father filed a second motion for a judgment of acquittal. The same day, the juvenile's court-appointed lawyer filed a similar motion, alleging that the juvenile was denied his "constitutional and statutory right to cross-examine witnesses and confront his accusers."[9] The motion by the lawyer hired by the father alleged that the juvenile's parents were denied the same right. Neither motion mentioned any potential or actual conflicts of interest between the lawyer hired by the father and the juvenile's court-appointed lawyer, nor between the juvenile and his parents.

The first time the issue of any potential conflict of interest was raised by either attor-

7. The juvenile committed his offenses during a party hosted by another male juvenile ("the host") at the host's home in Marion County, West Virginia. The party was held without parental supervision and alcohol was served. The host invited a friend of the victim (the victim did not know the juvenile) to the party, and the victim came with her friend. The host served the victim a substantial amount of alcohol and she became visibly intoxicated, close to "passing out." She was taken into the host's living room, where she was placed on a couch. While she was lying on the couch, the host asked her if she would have sex with him. She told him no, and asked him to leave her alone so that she could sleep. The host propped her up on the couch, reached underneath her shirt and fondled her breasts. The juvenile, who was present, asked the host, "Do you want to do it here or take her some where else," to which the host replied, "Well, you'll have to carry her. I can't walk." At that point the juvenile slung the victim over his shoulder (the victim was significantly smaller than the juvenile) and took her to a bedroom. She drifted in and out of consciousness. Her clothes were removed. She heard someone make the statement, "Do you want to do her first or me?" The next memory she had was a sharp pain caused by the juvenile's penis penetrating her vagina. She screamed, "Stop, that hurts." She opened her eyes and saw the juvenile standing between her spread legs. She later identified him by a shirt he was wearing. The victim's next recollection was being asked if she had ever been "eaten out" by someone, and feeling the tongue of the host between her legs. Friends took her away from the party, and she reported the incident to authorities. The evidence showed that the juvenile told people at the party that he "stuck it in there once, and she started bleeding," so he stopped. The host was also apparently charged with delinquency; the record does not show the result of that case. The victim testified that she had never had sexual intercourse before the rape.

9. These confrontation-clause-based arguments made below have not been pursued on appeal, perhaps because the record is clearly insufficient to establish any denial of the right to cross-examine witnesses. The juvenile's court-appointed lawyer has never suggested, either in this Court or below, that the lawyer hired by the father ever interfered with anything the juvenile's court-appointed lawyer wanted to do at trial. Thus, to the extent that the lawyer hired by the father examined witnesses rather than the juvenile's court-appointed lawyer, nothing in this record indicates that this circumstance was anything other than agreeable to the juvenile's court-appointed lawyer. In other words, there is no suggestion that the juvenile's court-appointed lawyer was ever denied an opportunity to cross-examine any witness. Moreover, it is clear that the lawyer hired by the father's cross-examinations were conducted as counsel for the juvenile, despite his putative role as parent's counsel.

ney was at a post-adjudication hearing held on January 3, 2002. During this hearing, the juvenile's court-appointed lawyer claimed that the juvenile's interests had diverged from those of his parents.

When asked by the court to cite specific instances of such conflict, the juvenile's court-appointed lawyer pointed only to one instance—allegedly divergent positions between the parents and the juvenile during plea negotiations. No affidavit or testimony was presented regarding this alleged conflict, only a brief statement by the juvenile's court-appointed lawyer. According to the juvenile's court-appointed lawyer, the juvenile refused the State's plea offer against his parent's advice. The juvenile's court-appointed lawyer told the court that during these plea discussions he informed the juvenile's parents that "... [his] obligation as a lawyer was to represent [the juvenile] and to honor [the juvenile's] desires. And at that point they [the parents' and the juvenile's interests] became opposed, Your Honor."

When the trial court asked for any instances of actual or potential conflict at trial involving evidence or witnesses, the lawyer hired by the father said that any details of any such instances were protected by and would not be disclosed because of the attorney-client privilege. Neither lawyer offered to inquire as to whether the parents or the juvenile would agree to waive the privilege with respect to any such details.

By order dated January 29, 2002, the court denied the juvenile's motion for judgment of acquittal.

The court held a dispositional hearing on April 2, 2002. After review of the juvenile probation officer's pre-sentence report, a psychological profile and sex offender evaluation, testimony by several witnesses, (including the investigating officer and several of the juvenile's teachers) the court denied the juvenile's motion for probation and home incarceration and committed the juvenile to the Industrial Home for Youth for a period of not less than one nor more than five years, or until he becomes twenty-one.

The juvenile assigns the following errors in the proceedings below:

1. Whether the juvenile was denied his right to effective assistance of counsel when the court permitted the parents' attorney to participate in the juvenile's trial, but ruled that the juvenile's attorney and parents' attorneys were to prepare a joint defense (act as co-counsel) and ruled that the juvenile's attorney and the parents' attorney could not both conduct *voir dire*, opening statements and cross-examination which created a conflict of interest.

2. Whether the court failed to make an adequate record at the dispositional hearing and abused its discretion in placing the juvenile at the Industrial Home for Youth, where the Department of Health and Human Resources and the independent expert recommended probation, the least restrictive alternative.

## II.

### Discussion

#### A.

##### Ineffective Assistance

In the syllabus points of *Cole v. White*, 180 W.Va. 393, 376 S.E.2d 599 (1988), which dealt with a claim of ineffective assistance of counsel arising out of an asserted conflict of interest resulting from a trial court's ruling regarding representation by counsel, we set forth the following:

1. The right of a criminal defendant to assistance of counsel includes the right to effective assistance of counsel.

2. Where a constitutional right to counsel exists under *W.Va. Const.* art. III § 14, there is a correlative right to representation that is free from conflicts of interest.

3. When constitutional claims of ineffective assistance of counsel, due to a conflict of interest are raised, either on direct appeal of a criminal conviction or in a habeas corpus proceeding founded on similar allegations, we apply the standard of review embodied in Syllabus Point 3 of *State ex rel. Postelwaite v. Bechtold*, 158 W.Va. 479, 212 S.E.2d 69 (1975), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1976):

"[...] one who claims ineffective assistance of counsel by reason of conflict of interest in the joint representation must demonstrate that the conflict is actual and not merely theoretical or speculative."

4. [...O]nce an actual conflict is found which affects the adequacy of representation, ineffective assistance of counsel is deemed to occur and the defendant need not demonstrate prejudice.

Additionally, we have stated that

[a]n ineffective assistance of counsel claim presents a mixed question of law and fact; we review the circuit court's findings of historical fact for clear error and its legal conclusions *de novo*. This means that we review the ultimate legal claim of ineffective assistance of counsel *de novo* and the circuit court's findings of underlying predicate facts more deferentially.

*State ex rel. Daniel v. Legursky,* 195 W.Va. 314, 320, 465 S.E.2d 416, 422 (1995).

■ The principal goal of all legal proceedings involving juveniles is to protect the juveniles' best interests. *W.Va.Code,* 49–1–1(a) [1999]; Syllabus Point 4, *State ex rel. B.S. v. Hill,* 170 W.Va. 323, 294 S.E.2d 126 (1982). Individuals under the age of 18 are presumed to be persons under a legal disability. *W.Va.Code,* 2–2–10(m) [1998]. This Court has ruled that they lack the capacity to make legally binding decisions. *State ex rel. J.M. v. Taylor,* 166 W.Va. 511, 517, 276 S.E.2d 199, 203 (1981). An infant is not legally competent to sue or be sued in his own name, but must be represented by a legally authorized person such as a guardian. *W.Va.Code,* 56–4–9 [1923], 56–4–10 [1923].

■ Although a court may appoint a guardian *ad litem* in a case where there may be conflicting interests of a parent, parents are their child's natural guardians, and are presumed to act in their child's best interests. *State ex rel. Kiger v. Hancock,* 153 W.Va. 404, 168 S.E.2d 798 (1969) (preference in the law that juvenile's natural parents serve as guardians in legal proceedings); *accord,* 9A Michie's Jurisprudence, *Guardian and Ward* § 2.

Both the Legislature and this Court have recognized that a child's parents may play an important role in protecting the juvenile's substantive and procedural rights in delinquency adjudications. *See W.Va.Code,* 49–5–2(*l*) [2001] (juvenile between the ages of 14 and 16 may waive *Miranda* rights upon the informed advice of the juvenile's parents or custodian); *W.Va.Code,* 49–5–6 [1998] (parent may request jury trial on behalf of juvenile); *W.Va.Code,* 49–5–9(a)(1) [1998] (court must inform juvenile and his parents of the juvenile's right to be represented by counsel at all stages of the proceedings).

We stated in *State ex rel. J.M. v. Taylor,* 166 W.Va. 511, 517, 276 S.E.2d 199, 202 (1981):

An interested, friendly adult is supposed to protect an infant from governmental coercion or pressure and to allow someone capable of understanding the nature and consequences of the waiver to help in decisions and protect the child from inaccurate accounts of his statements at proceedings in which waiver is made.

However, it does not follow that the Legislature, by requiring that parents be named as respondents in a juvenile delinquency proceeding, intended for the parents in juvenile delinquency adjudications to have *carte blanche* to participate as full and independent parties in the proceedings.

A juvenile delinquency proceeding is not an abuse and neglect action, nor is it a custody proceeding, nor is it a trial on a charge of "contributing to the delinquency of a minor." In such proceedings, parents are more clearly real parties in interest. In juvenile delinquency proceedings, our law does not so clearly distinguish a separate parental interest, although of course the interest of a parent in his child's custody is always present.

*W.Va.Code,* 49–5–7(b) [2003] requires that "parents, guardians, or custodians shall be named in the petition as *respondents,* and shall be served with notice of the proceedings . . . ." (Emphasis added.) The term "respondent" is not defined in the Juvenile Proceedings Article of the Code. *See W.Va.Code,* 49–5–1, *et seq.*

■ This Court has ruled that separate statutes addressing juvenile justice "must be read and applied *in pari materia* in order to give effect to the Legislative intent gathered from the whole of the enactments." *State ex rel. M.L.N. v. Greiner*, 178 W.Va. 479, 483, 360 S.E.2d 554, 558 (1987). The focus of *W.Va.Code*, 49–5–1 *et seq.* is upon the juvenile's substantive and procedural rights, without separate or distinctive provisions regarding the rights of parents.[10] *See W.Va. Code*, 49–5–2(e)(1)–(2) [2001] (upon the filing of a petition the circuit court shall have jurisdiction over the *juvenile* ); *W.Va.Code*, 49–5–2(h) [2001] (*a juvenile* has the right to be effectively represented by counsel at all stages of the proceeding); *W.Va.Code*, 49–5–2(i) [2001] (in all proceedings under this article, *the juvenile* shall be afforded a meaningful opportunity to be heard, to testify, and cross examine witnesses); *W.Va.Code*, 49–5–2(j) [2001] (at all adjudicatory hearings under this article, all procedural rights afforded to adults in criminal proceedings shall be afforded the *juvenile*); *W.Va.Code*, 49–5–9(a)(1) [1998] (if the *juvenile* is not represented by counsel, the court must inform the juvenile and his parents, guardian or custodian of the *juvenile's* right to be represented by counsel).

■ When read *in pari materia* with the rest of the Juvenile Proceedings chapter, and in light of a parent's traditional role as the child's guardian, it is clear that the Legislature enacted *W.Va.Code*, 49–5–7(b) [2003], naming the juvenile's parents as respondents, in order to ensure that there is an adult present who will presumably act in the juvenile's best interests. In recognition of the important decisions a juvenile defendant may be called upon to make during a delin-quency proceeding, and the ordinary desirability of parental input in these decisions, the Legislature mandated parental participation.

Even in those cases where the State provides counsel, a parent's role in a juvenile adjudication may often be pivotal. There is ordinarily a bond of trust between a loving parent and his child that counsel may never attain. Oftentimes parents are valuable resources for defense counsel, providing necessary background information that the juvenile may not know or remember. Additionally, by requiring the State to serve the parents with a copy of the petition, the statute ensures that parents are provided with adequate notice of the pending proceedings. *In re C.R.H.*, 163 Ill.2d 263, 206 Ill.Dec. 100, 644 N.E.2d 1153, (1994) (adequate notice to minor and minor's parents is mandated by the due process clause of the Federal Constitution).

■ Based on all of the foregoing, we hold that the requirement in *W.Va.Code*, 49–5–7(b) [2003] that a juvenile's parents be named as respondents in a juvenile proceeding does not create an entitlement on the part of the juvenile's parents to participate as full and separate parties in a juvenile delinquency proceeding. Thus, the trial court's decision to denominate and treat the parents as full "parties" during the adjudication proceeding, while entirely understandable in light of the statutory language, was nevertheless erroneous.[11]

But this "party" treatment was requested by the juvenile's court-appointed lawyer, who continues to defend the ruling in his brief to this Court. Moreover, as we discuss *infra*, there is no evidence that the juvenile's de-

---

**10.** *W.Va.Code*, 49–5–6 [1998], which provides that the juvenile or the juvenile's parents may request a jury trial, does not support the contention that the juvenile's parents are independent parties in the proceeding. A juvenile may or may not be competent to decide whether it will be in his or her interest to demand a jury trial. Therefore, in those instances in which the juvenile does not have the ability to properly protect his procedural right to demand a jury trial, his parents, as the child's natural guardians, may do so. The juvenile's argument confuses a parent's right to advise their children of their rights and the exercise of their own rights.

**11.** If there had been circumstances indicating that the parents had a serious and tangible interest that was hostile to the interest of the juvenile and that might be affected by the result of the adjudication—or even if the court had reason to believe that the parents' influence over the juvenile would be contrary to his best interests—the trial court could have appointed a guardian *ad litem* for the juvenile. This of course was not the case.

fense was adversely impacted by the trial court's ruling. The practical effect of the trial court's ruling was to allow the juvenile to be defended both by his publicly-paid, court-appointed lawyer—and by an additional lawyer whose services were procured by his parents by other means. The record supports the conclusion that the purpose and result of the lawyer hired by the father's putative representation of the parents was merely to add another lawyer to the juvenile's defense team.[12]

The juvenile claims that both counsel should have been allowed to cross-examine the State's witnesses. However, the juvenile has never alleged that the juvenile's court-appointed lawyer was precluded from cross-examining any witness. Had the juvenile's lawyer and the lawyer hired by the father had any disagreement as to who should cross-examine a witness, the juvenile's court-appointed lawyer could have stood up and asked the court to resolve the issue, before the witness testified. He never did so, and there is no evidence suggesting that the juvenile's court-appointed lawyer ever relinquished control of his right to function as he pleased.

 As to the question of conflicts of interest: nothing has prevented the juvenile's lawyer from by affidavit or otherwise making a record in which he could detail any problems he had in the juvenile's representation due to the restraints placed on counsel at trial—or due to the participation of the lawyer hired by the parents. There is no such record. The juvenile seems to fault the trial court for not inquiring regarding possible conflicts. But the court was under no obligation to investigate conflicts unless they were brought to its attention or—at the least—readily assumable from the situation. Neither was the case.

Neither the juvenile or the lawyer hired by the father raised any sort of conflict during the first hearing, nor did they raise any in

their post-trial motions for judgment of acquittal, after the first hearing resulted in a mistrial.

In addition to offering no factual support for the contention that any actual conflicts existed, the juvenile's appeal offers no evidence or instance where any conflict adversely affected his attorney's performance. Instead, the appeal speculates that the court's "co-counsel" ruling *may* have required the juvenile's court-appointed lawyer to share confidential attorney-client communications with the lawyer hired by the father; and that the juvenile *may* have, because of his *possible* perception of the court-appointed attorney's possible "duty" to share communications with "co-counsel," not have told the juvenile's court-appointed lawyer everything he needed to know in order to present an effective defense. However, there is nothing in the record to support this sort of speculation upon speculation.

The juvenile's only other example of an allegedly conflict-based adverse effect of the trial court's "co-counsel" ruling is the claim that because the lawyer hired by the father discussed a defense theory in closing argument that the juvenile's court-appointed lawyer did not mention, the jury *may* have therefore perceived the juvenile's defense as "disjointed." The specifics of this claim are as follows: in his closing argument, the juvenile's court-appointed lawyer argued (1) that there was insufficient evidence that actual sexual intercourse took place; (2) that even if sexual intercourse did take place, the victim was not "physically helpless;" and (3) that even if the victim was physically helpless, the juvenile was nevertheless not aware of this and the State was unable to prove criminal intent.

In his closing argument, the lawyer hired by the father adopted the defense theories that were argued by the juvenile's court-appointed lawyer. Additionally, the lawyer hired by the father suggested to the jury another reason for finding reasonable

---

**12.** We have not reviewed the orders or any supporting financial affidavits that supported the appointment of publicly-paid counsel for the juvenile. An additional reason (albeit unrelated to the issues in this appeal) to question the trial court's ruling that the parents were entitled to be treated as separate parties with their own counsel is that the general application of such a principle in juvenile proceedings would bring confusion and the possibility of unfair manipulation to the issue of when public funds must be used to pay for a juvenile's defense.

doubt—the possibility that the victim was not sexually assaulted at the party, but that she instead was assaulted on the following evening while she was staying at a friend's.[13]

It is not uncommon for a criminal defendant to advance two or more somewhat contradictory theories as possible explanations of the evidence that may raise a reasonable doubt—hoping that one theory may connect with a juror. (When the defendant chooses to not take the stand and tell a particular version of events, as in the instant case, presenting multiple alternative exculpatory theories is more feasible.)

Quite obviously, there was a strategic "downside" in presenting the theory that the victim was not telling the truth in claiming that it was the juvenile who performed a sex act on her. But the juvenile's court-appointed lawyer made the same sort of suggestion about the victim's credibility, when he argued to the jury that the victim's claim of "helplessness" was false; and when he suggested that the victim willingly participated in sexual contact with the juvenile—the court-appointed lawyer suggested that the jury could believe that the victim was "laughing and

helping out" the juvenile in removing the victim's clothes.

Nothing in the record supports the conclusion that the fact that the lawyer hired by the father made a particular argument was the result of any conflict of interest; that the juvenile or his court-appointed lawyer questioned or opposed the advancing of any theory by the lawyer hired by the father; or that the juvenile's defense was prejudiced by the fact that both lawyers made closing arguments.[14]

As previously noted, the test in ineffective assistance of counsel cases based upon asserted conflicts of interest is actual, not theoretical or speculative, conflict, leading to an adverse effect upon counsel's performance. Syllabus Point 3, *State ex rel. Postelwaite v. Bechtold*, 158 W.Va. 479, 212 S.E.2d 69 (1975). *Cole v. White*, 180 W.Va. 393, 376 S.E.2d 599 (1988). Applying this test, we conclude that there has been no showing of any actual conflict, and we will not presume one simply by the presence of a juvenile's parents in a case in a technically erroneous posture. Additionally, there has been no

13. The evidence that the lawyer hired by the father pointed to in support of this theory was emergency room notes giving the date of the incident as a day after the party, and indicating that a tear to the victim's vaginal wall was less than twelve hours old—although the victim was examined in the hospital emergency room about twenty-four hours after the incident. The prosecution explained these as typographical or inconsequential errors, and the jury credited this explanation in light of all of the evidence, including testimony from persons at the party that the juvenile had admitted the sex act.

14. If the juvenile's court-appointed lawyer felt before or during the trial that the involvement of the parents or the lawyer hired by the father was affecting the court-appointed lawyer's ability to effectively communicate with his client, the court-appointed lawyer had an ethical obligation to act. And if the juvenile's court-appointed lawyer believed at any time *after* the trial that such communication problems might have occurred, he had a similar duty to develop evidence regarding these problems and present it to the circuit court in a post-trial proceeding. In his brief and at oral argument in the instant appeal, the juvenile's court-appointed lawyer suggests an additional reason that he says should cause us to find that the juvenile did not receive the effective assistance of counsel. The court-appointed law-

yer suggests that without appreciating it at the time, he was overwhelmed and impaired in representing his client by the role of the juvenile's parents and the attorney hired by the father. As we have noted, the juvenile's court-appointed attorney welcomed the court's ruling granting the parents "party" status—his only complaint below (and in his assignments of error on appeal) has been that the parents' lawyer's trial role was somewhat circumscribed. As to specifically how the trial court's ruling led to the impairment of the court-appointed lawyer's representation, he offers no more specifics than those that we have already discussed and discounted. The juvenile's court-appointed lawyer may speculate that the defense strategy of admitting nothing, going to trial, and zealously contesting every prosecution witness was in hindsight a mistake. The juvenile's court-appointed counsel may now feel that adhering to this strategy was the result of the improper involvement of the parents, so that the juvenile wouldn't or couldn't independently face up to what he had done and the strength of the case against him. The only evidence in the record is to the contrary—that the juvenile's parents were apparently in favor of accepting a State-offered plea bargain that the juvenile chose to reject. In any event, this argument is entirely contrary to the assertion in the instant appeal that the juvenile's factual adjudication was incorrect and should be reversed.

showing of any adverse effect on counsel's effectiveness.

Although the first jury could not reach a unanimous result, the record in the second trial, where the jury found against the juvenile beyond a reasonable doubt, is heavily weighted with evidence showing that the juvenile and his friend carried a severely intoxicated and at times unconscious young woman into a bedroom, stripped her clothes from her, and sexually assaulted her.

The victim has now testified and been subjected to cross-examination at least three times as she told her version of the events at the party. The juvenile has refused to admit any culpable conduct; and has never, it appears, told his version of the events at the party. This, of course, was his right. But the State also had a right—to a trial and to a jury's verdict on the issue of the juvenile's factual guilt. In the trial process, the juvenile was entitled to, and received, a zealous defense, by two experienced lawyers; and they put the prosecution and its witnesses to the test.

Clearly, a juvenile in a delinquency proceeding has the right to his or her own counsel, and the rights and role of a juvenile's parents are just as clearly subsidiary to those of the juvenile. The rights of the juvenile include ultimately the right to control the case—although the special status of juveniles before the law and the law's strong interests in protecting juveniles (even from themselves in some circumstances), and in supporting family relationships, requires

courts to see that a juvenile has the benefit of adult (and where reasonable, parental) advice and counsel in the exercise of the juvenile's rights. In the instant case, there is no basis for concluding that the juvenile's right to "control his case" was impaired by the court's erroneous allowance of "party" status to the parents.

We conclude that the juvenile received a fair trial with respect to his legal guilt or innocence; a trial in which he did not receive the ineffective assistance of counsel. We therefore decline the juvenile's suggestion that we should reverse his adjudication and remand this case for a third trial.

## B.

### The Juvenile's Disposition

■ In his second assignment of error, the juvenile alleges that the trial court failed to make an adequate record at the dispositional hearing and abused its discretion in committing the juvenile to the Industrial Home for Youth.[15]

■ In the case of *State ex rel. D.D.H. v. Dostert*, 165 W.Va. 448, 471, 269 S.E.2d 401, 416 (1980), this Court stated that when the trial court has properly considered all relevant factors, the "discretionary dispositional decisions of the trial courts should only be reversed where they are not supported by the evidence or are wrong as a matter of law." Where the record discloses that such full consideration has not taken place, a dis-

---

**15.** The court entered a dispositional order on April 22, 2002, committing the juvenile to the Industrial Home for Youth for a period of not less than ten nor more than twenty-five years, or until the juvenile respondent reaches the age of twenty-one, whichever occurs first, for the second degree sexual assault charge; and for the conspiracy to commit a felony charge, for a period of one to five, or until the juvenile reaches twenty-one, whichever comes first. By the time the order was entered, the juvenile was seventeen. The trial court's dispositional order states the following facts and conclusions as supporting the court's ruling:

1. The violent nature of the offenses for which the infant respondent stands convicted;
2. The infant respondent's complete lack of remorse and the fat that he considers himself to be the victim in this proceeding;

3. The infant respondent's numerous failures in the past to conform to the regulations of home confinement;
4. The infant respondent's complete lack of respect for authority;
5. The infant respondent's past use of alcohol and drugs;
6. The recommendations of the State of West Virginia and the juvenile probation officer;
7. The parents' failure, in the past, and likely failure in the future, to provide adequate supervision of the infant respondent if he were left in their custody makes continuation in the home contrary to the best interests of the infant respondent; and
8. Incarceration, and the structure provided therein, is in the best interests of the infant respondent and would best serve the welfare of the public.

positional order cannot be sustained. *See Larry L. v. State*, 191 W.Va. 165, 444 S.E.2d 43 (1994)(*per curiam* ); *State ex rel. S.J.C. v. Fox*, 165 W.Va. 314, 268 S.E.2d 56 (1980).

In looking at the disposition in the instant case, the following facts, well shown in the record below, are pertinent. The juvenile was adjudicated delinquent for acts which had he been an adult would have resulted in sentences of ten to twenty-five years on the sexual assault count and one to five years on the conspiracy count. The lower court rightly found that the nature of the juvenile's offense was violent and horrific. As a result of the juvenile's conduct an innocent young woman may well suffer for the rest of her life.

Despite the serious nature of the charges facing him, the juvenile showed a lack of full appreciation of the court's authority. The State brought him to court twice for violating the conditions of his bond. After his first violation, the juvenile was committed to the Northern Regional Detention Center for less than a month. Although the juvenile characterizes this treatment as "heavy-handed," the State did not object to a subsequent motion requesting that the juvenile be placed on home confinement. While on home confinement, he was allowed to attend wrestling matches and baseball games. Despite the court's admonitions, the juvenile again violated the terms of his bail. In light of the serious nature of the charges facing him, the juvenile's conduct prior to his conviction supported the circuit court's conclusion that the juvenile did not appreciate the seriousness of his conduct, and in fact considered himself. as the "victim" in the trial situation.

Additionally, the juvenile's parents failed to adequately supervise him, and themselves did not appreciate or acknowledge the nature of their son's misconduct. The sexual assault occurred at a party attended by the juvenile with no adult supervision, where alcohol was served. The juvenile's father tried to minimize his son's bond conditions violation. Notwithstanding the previous violations, the juvenile's father requested that the court grant the juvenile more home confinement "windows," stating that, "even defendants in jail get some sort of outside recreational time," thus reinforcing his son's belief that the system was victimizing him. The juvenile admitted to a post-trial interviewer that he had been using alcohol and drugs since he was twelve, and had been intoxicated a number of times prior to the incident. But the juvenile's father stated that he was only aware of one other occasion when his son had used alcohol. The father expressed his belief that his son's troubles were not his own fault, but stemmed from the company he kept.

The juvenile's probation officer testified that he considered commitment to the Industrial Home for Youth the most appropriate placement. The probation officer based his recommendation upon the juvenile's failure to express responsibility or remorse for his conduct, a doubt that the juvenile would respond to treatment outside of a secure facility, and the availability of appropriate treatment at the Industrial Home.[16]

According to his sex offender evaluation, the juvenile's treatment index indicated that he might not be motivated for treatment, due to his unwillingness to accept his conviction. The sex offender evaluator told the court that she believed the juvenile to be amenable to outpatient treatment; but, according to her report, the juvenile, on advice of counsel, refused to discuss the facts of his case. Therefore, she had no knowledge regarding the juvenile's perception of his conduct on the evening of the incident.[17]

From all of the interactions of the juvenile with the court, it is clear that the court had a basis for concluding that neither the juvenile nor his parents at the time of his disposition acknowledged or appreciated the serious

---

**16.** While the abuse of alcohol clearly played a role in the incident in question, the juvenile had not sought or received treatment for substance abuse. According to his probation officer, this treatment would be available in the Industrial School. The probation officer testified that the juvenile said: "I was accused of[,] and until the jury came to their verdict, I was innocent of[,] the allegations." When asked by the probation officer whether he would be amenable to treatment, the juvenile stated that he would attend treatment "if you guys want me to."

**17.** We omit other details of this evaluation that supported the circuit court's ruling.

wrongfulness of his misconduct, the conditions and problems that apparently led to that misconduct or the need to take serious steps that could lead to such an acknowledgment, appreciation, change of conditions, and addressing of problems.

■■■ The fact that the juvenile had and has been advised by counsel not to discuss the events leading to the charges against him and his conduct in connection with those events—presumably at least in part because of the possibility of a reversal of his adjudication on appeal—obviously impaired (and may still impair) the trial court's ability to assess the juvenile's ability and willingness to accept responsibility for wrongdoing, to express remorse, and to engage in rehabilitative programs, in any dispositional setting. In such circumstances, the court must simply make do with what it has. As we stated in Syllabus Point 6 of *State ex rel. D.D.H. v. Dostert*, 165 W.Va. 448, 269 S.E.2d 401 (1980):

> In considering the least restrictive dispositional alternative for sentencing a juvenile, a juvenile court must consider the reasonable prospects for rehabilitation of the child as they appear *at the time of the dispositional hearing*, with due weight given to any improvement in the child's behavior between the time the offense was committed and the time sentence is passed.

Syllabus Point 3, *State ex rel. S.J.C. v. Fox*, 165 W.Va. 314, 268 S.E.2d 56 (1980) (emphasis added).

In the instant case, the court at the time of the dispositional hearing was not only entitled but required to assume that the jury's findings were correct factually and legally; and that the juvenile's continued unwillingness to discuss what he had done was consistent with a demonstrated attitude of denial that, while constitutionally absolutely permissible, was also contrary to the juvenile's best interests and his progress in rehabilitation.

Under these circumstances, we do not believe that the trial court abused its discretion in placing the juvenile in circumstances that

the court believed would be more conducive to the juvenile's moving in the direction of appreciating the wrongfulness of his conduct and in removing the juvenile from the circumstances that had led to his misconduct, and placing him where he could receive assistance in developing skills to help him move forward in a positive direction.

Having said this, we hold based on the record before us that the circuit court, in its regular reviews of the juvenile's case, should be particularly attuned to evaluating the juvenile's acceptance of responsibility and rehabilitative progress following this Court's affirmance of his adjudication. The record before us suggests that the juvenile has been making very good progress, academically and otherwise. If the appellate affirmance of the juvenile's adjudication and disposition results in the sort of acceptance of responsibility and acknowledgment of wrongdoing that can enhance rehabilitative progress, the circuit court should have additional strong grounds to consider early release from confinement.

## IV.

### Conclusion

Based on the foregoing reasoning, the judgment of the Circuit Court of Marion County is affirmed.

Affirmed.

Justice DAVIS dissents and files a dissenting opinion.

DAVIS, J., dissenting.

In this juvenile delinquency proceeding, the juvenile was appointed counsel by the circuit court.[1] However, during the adjudicatory phase of the proceeding, the circuit court permitted counsel for the juvenile's parents to participate fully in the proceeding, along with appointed counsel. The majority opinion has determined that counsel for the juvenile's parents should not have been allowed to participate in conducting the defense. However, the majority opinion concluded that there was no prejudice shown

---

1. "A juvenile's constitutional right to counsel was recognized by the United States Supreme Court in 1967 in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)." *State ex rel. J.M. v. Taylor*, 166 W.Va. 511, 514, 276 S.E.2d 199, 201 (1981).

from such participation. For the reasons set out below, I dissent.

### The Error in this Case Did Not Require Showing Prejudice

The United States Supreme Court has observed that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error[.]" *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705, 710 (1967) (footnote omitted). Thus, it has been held that "[a]ctual or constructive denial of the assistance of counsel ... is legally presumed to result in prejudice." *Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674, 696 (1984). The United States Supreme Court "has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *United States v. Cronic*, 466 U.S. 648, 659 n. 25, 104 S.Ct. 2039, 2047 n. 25, 80 L.Ed.2d 657, 668 n. 25 (1984).

> Thus, when a defendant is completely denied assistance of counsel during a critical stage of judicial proceedings, when the state interferes in various ways with counsel's assistance, or when certain types of conflicts of interest are present, prejudice is presumed simply upon a showing that the actual or constructive deprivation occurred.

*People v. Robles*, 74 P.3d 437, 439 (Colo.Ct. App.2003). Moreover, "constructive denial will be found when counsel fails 'to subject the prosecution's case to meaningful adversarial testing....'" *Childress v. Johnson*, 103 F.3d 1221, 1228 (5th Cir.1997) (quoting *Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047, 80 L.Ed.2d at 668). This is to say that, although counsel is present, "the performance of counsel may be so inadequate that, in effect, no assistance of counsel is provided." *Cronic*, 466 U.S. at 654 n. 11, 104 S.Ct. at 2044 n. 11, 80 L.Ed.2d at 665 n. 11. *See also Holloway v. Arkansas*, 435 U.S. 475, 489–90,

98 S.Ct. 1173, 1181, 55 L.Ed.2d 426, 438 (1978) (noting that the mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate is silent on crucial matters); *Belcher v. State*, 93 S.W.3d 593, 598 (Tex.Ct.App.2003) ("[T]he physical presence of counsel does not prevent his 'absence' .... To the contrary, 'absence' means simply the defendant was without counsel, either literally or figuratively." (Citation omitted)).

The presumption of prejudice when there is an actual or constructive denial of counsel is necessary because, " '[o]f all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have.' " *Cronic*, 466 U.S. at 654, 104 S.Ct. at 2044, 80 L.Ed.2d at 664 (footnote omitted).[2] *See also Judith P. v. Superior Court*, 102 Cal.App.4th 535, 555, 126 Cal.Rptr.2d 14, 30 (2002) ("[E]rrors that result in automatic reversal ... include ... deprivation of the right to counsel[.]"); *Wofford v. State*, 819 So.2d 891, 892 (Fla.Dist.Ct. App.2002) ("[D]enial of the Sixth Amendment right to counsel is per se reversible error."); *Propes v. State*, 550 N.E.2d 755, 758 (Ind. 1990) ("[V]iolation of the right to counsel is fundamental error, reversible *per se* despite other, independent evidence sufficient to support a conviction."); *State v. Thompson*, 355 S.C. 255, 261, 584 S.E.2d 131, 134 (Ct.App. 2003) ("The erroneous deprivation of a defendant's fundamental right to the assistance of counsel is *per se* reversible error."); *D.L.J. v. State*, 981 S.W.2d 815, 816 (Tex.Ct.App.1998) ("Denial of the right to counsel at the certification hearing was structural error that is per se reversible; no harmless error analysis is required.").

In the instant case, a constructive denial of counsel occurred. This is true because the juvenile's counsel shared the duty to represent him with an attorney that was under no legal obligation to represent the juvenile.[3] Two cases will help illustrate my position.

---

**2.** The right to counsel is guaranteed under both "Section 14 of Article III of the West Virginia Constitution and the Sixth Amendment to the United States Constitution[.]" Syl. pt. 6, in part,

*State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 465 S.E.2d 416 (1995).

**3.** This situation would be different if the trial court had appointed the parents' counsel to act

In the first case, *People v. McGraw,* 119 Cal.App.3d 582, 174 Cal.Rptr. 711 (1981), the defendant was charged separately for committing burglary and possession of stolen property. The defendant was represented by retained counsel for the burglary charge, and was appointed a public defender for the possession of stolen property charge. The two charges were consolidated for a single trial. With the trial court's permission and the defendant's consent, retained counsel did not assist with or participate in the selection of the jury. The defendant was ultimately convicted by a jury on both charges. In the appeal, the defendant argued that the failure of appointed counsel to participate in jury selection denied him the constitutional right to assistance of counsel on the possession of stolen property charge. The appellate court agreed with the defendant as follows:

What retained counsel characterized as "minimal" representation, this court holds to be a denial of appellant's constitutional right to assistance of counsel, reversible error per se. Unless waived, a criminal defendant is entitled to the assistance of a competent, active and diligent attorney during jury impanelment.

The People contend that the record demonstrates that [the retained counsel] "in fact substituted" for [the appointed counsel] during jury selection. The People's contention is without merit. Further, appellant's asserted consent to and apparent approval of [the appointed counsel's] "minimal" representation ... did not meet even the minimal constitutional requisites for a valid waiver of the right to counsel.

*McGraw,* 119 Cal.App.3d at 587, 174 Cal. Rptr. at 712 (internal citations omitted).

The second case I wish to consider is *Penson v. Ohio,* 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988). In *Penson,* the defendant and two co-defendants were found guilty by an Ohio jury of several crimes. The defendant was sentenced to a term of imprisonment of eighteen to twenty-eight years. The defendant was subsequently ap-

pointed counsel to perfect an appeal. However, his counsel filed a "Certification of Meritless Appeal and Motion," wherein it was said that there were no grounds for reversing the conviction. The defendant's counsel also asked to withdraw as appellate counsel. The Ohio appellate court permitted counsel to withdraw. The appellate court eventually reviewed the defendant's appeal based upon the record in the case. The appellate court also considered the briefs and arguments by counsel for the co-defendants:

In reviewing the record and the briefs filed by counsel on behalf of [defendant's] codefendants, the court found "several arguable claims." Indeed, the court concluded that plain error had been committed in the jury instructions concerning one count. The court therefore reversed [defendant's] conviction and sentence on that count but affirmed the convictions and sentences on the remaining counts. It concluded that [defendant] "suffered no prejudice" as a result of "counsel's failure to give a more conscientious examination of the record" because the court had thoroughly examined the record and had received the benefit of arguments advanced by counsel for [defendant's] two codefendants.

*Penson,* 488 U.S. at 79, 109 S.Ct. at 349, 102 L.Ed.2d at 308 (internal citations omitted). The Ohio supreme court affirmed the appellate court decision. The United States Supreme Court granted certiorari and reversed the decision on the following grounds:

No one disputes that the Ohio Court of Appeals concluded that the record below supported a number of arguable claims. Thus, in finding that petitioner suffered no prejudice, the court was simply asserting that, based on its review of the case, it was ultimately unconvinced that petitioner's conviction—with the exception of one count—should be reversed. Finding harmless error or a lack of *Strickland [v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] prejudice in cases such as this, however, would leave indigent criminal appellants without any of the pro-

---

as co-counsel for the juvenile. If that had occurred, then the parents' attorney would be legally and ethically obligated to protect the rights of the juvenile. The record in this case is clear in

showing that at all times during the proceeding, the parents' counsel was under no legal or ethical obligation to represent the juvenile.

tections afforded by *Anders [v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)]. . . .

Nor are we persuaded that the Court of Appeals' consideration of the appellate briefs filed on behalf of petitioner's code-fendants alters this conclusion. One party's right to representation on appeal is not satisfied by simply relying on representation provided to another party. To the contrary, "[t]he right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client. *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 [(1942)]." *Von Molt-ke v. Gillies,* 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948) (plurality opinion). A criminal appellant is entitled to a single-minded advocacy for which the mere possibility of a coincidence of interest with a represented codefendant is an inadequate proxy.

*Penson,* 488 U.S. at 86–87, 109 S.Ct. at 353 (internal citation to record and footnote omitted).

The decisions in *Penson* and *McGraw* stand for the proposition that, absent a valid waiver by a defendant, only the counsel of record for a defendant on a charge may represent the defendant during critical stages of a prosecution. Under *Penson* and *McGraw,* prejudice is presumed when a defendant's counsel relinquishes any part of the representation of the defendant to an attorney who is not on record as counsel for the defendant.

*Penson* and *McGraw* should have controlled the outcome of the instant case. The record is devoid of any evidence of a valid waiver by the juvenile of his right to have appointed counsel conduct his defense. *See State v. Sugg,* 193 W.Va. 388, 397, 456 S.E.2d 469, 478 (1995) ("Thus, when a constitutional right is at stake, its waiver must be knowing, intelligent, and voluntary."). Absent such a waiver, the juvenile's counsel *could not* agree to let counsel for the juvenile's parents have

an active role in the defense. *See Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 835, 83 L.Ed.2d 821, 828 (1985) ("[An effective attorney] must play the role of an active advocate, rather than a mere friend of the court."). By doing so, the juvenile's constitutional right to counsel during every critical stage of the prosecution was constructively denied.[4] Consequently, the issue of prejudice was irrelevant. *See Perry v. Leeke,* 488 U.S. 272, 280, 109 S.Ct. 594, 600, 102 L.Ed.2d 624, 633 (1989) (actual or constructive denial of the assistance of counsel is not subject to prejudice analysis); *Herring v. New York,* 422 U.S. 853, 864, 95 S.Ct. 2550, 2556, 45 L.Ed.2d 593, 601–02 (1975) (presumption of prejudice where defense counsel denied right to give closing argument); *Mitchell v. State,* 989 S.W.2d 747, 748 (Tex.Crim.App.1999) (En banc) ("In these circumstances no affirmative proof of prejudice is required because prejudice is irrefutably presumed.").

In view of the foregoing, I dissent.

---

**4.** The Supreme Court has interpreted "critical stage" to mean "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's

right to a fair trial." *United States v. Wade,* 388 U.S. 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149, 1157 (1967) (footnote omitted).